105 Cal.App.2d 239 (1951)
J. LANE KENDALL, Appellant,
v.
BOARD OF OSTEOPATHIC EXAMINERS, Respondent.
Civ. No. 14668. 
California Court of Appeals. First Dist., Div. One. 
July 2, 1951.
 Piccirillo & Wolf for Appellant.
 J. Robert Meserve for Respondent.
 BRAY, J.
 Respondent board, after a hearing of certain charges, revoked petitioner's license as a drugless practitioner. On application to the superior court for a writ of mandate to compel the restoration of the license, the revocation was affirmed and the writ denied. Petitioner appeals.
 Questions Involved
 1. Are the findings of the trial court and the board supported by the weight of the evidence?
 2. Was petitioner denied a fair hearing because of alleged prejudice of a board member?
 3. Concerning charges as to which no evidence was offered, was the board required to dismiss with prejudice?
 Record
 Petitioner was charged by the board with violation of section 2377 of the Business and Professions Code by procuring a criminal abortion on the persons of three women, referred to herein as (1) Sylvia, (2) Dolores, and (3) Eleanor, and by violating section 2394 of the Business and Professions Code by using drugs and penetrating the tissues of Sylvia. Two hearings were had. No evidence was introduced to support the abortion charges as to Sylvia and Dolores and these charges were dismissed by the board without prejudice. The board found petitioner guilty of unprofessional conduct in that he had procured and performed a criminal abortion on Eleanor and had used drugs and penetrated the tissues of Sylvia. A petition for reconsideration was denied by lapse of time. Petitioner then filed the present mandamus proceeding in the superior court, which heard oral argument and thoroughly read the transcripts of the board hearings. No additional evidence was produced other than petitioner's petition for reconsideration and a letter of the board's attorney. The trial court exercised its independent judgment and made findings of fact and conclusions of law to the effect that (1) petitioner agreed to and did perform and procure a criminal abortion on Eleanor, who was then pregnant, which fact was known *242 to petitioner, and (2) that petitioner used and administered drugs to Sylvia to check an infection, and that none of the services were performed as an emergency treatment; (3) that the board's findings are supported by the weight of the evidence, and (4) that the board was not, as charged, guilty of abuse of its discretion.
 1. Evidence.
 [1] Our province is to review the evidence in the light most favorable to respondent and to determine whether there is any substantial evidence, contradicted or uncontradicted, which will support the trial court's conclusions. (Moran v. Board of Medical Examiners, 32 Cal.2d 301 [196 P.2d 20].) We will consider the charges separately.
 The Abortion Charge.
 [2] The testimony of Eleanor alone is sufficient to support the court's conclusion. It is unnecessary to go into great detail on this charge. Eleanor testified that when she thought herself pregnant she did not want to go through with it as she was considering leaving her husband. She took some quinine tablets to abort herself. Then she changed her mind and consulted Dr. Wynekoop on May 7. (Dr. Wynekoop testified that he then found her pregnant "beyond any ordinary doubt." He found no sign of a miscarriage.) Eleanor again changed her mind, and decided not to have the baby. She did nothing herself to abort. In the early part of June she went to petitioner's office. Her cousin had informed her that petitioner had aborted the cousin. Eleanor told petitioner that she was pregnant, and could not afford to remain pregnant because she would have to go to work, and maybe he could help her. He said he would try to cause her to lose her baby on condition that she would not tell. He then directed her to a small room, told her to take off her underclothes and lie on a table. She then described the acts of attempted abortion and her sensations, which were of such a nature as to leave no doubt that an abortion was attempted. Admittedly no drugs or medicinal preparations were used. Eleanor's evidence, however, shows that "something cutting like a knife" was used. Petitioner told her he thought the treatment was successful and if it were not she was to come back. He told her she would have cramps and gave her some pills to take after she had them for a certain length of time. She gave petitioner two checks totalling $22.21 and $15 in cash and promised to pay the balance of the $75 he asked in two weeks. *243 No receipt was asked for or given. He told her that now that he had helped her she was not to tell except that if she knew someone who needed help to send her to him. Eleanor went home and about six hours later started to get "awful cramps." They had continued for about an hour when her husband returned home about 11 p. m. At first she refused to tell him the cause of her distress. He was a policeman and carried a gun. He then forced her at gunpoint to disclose its cause. She then told him and later other officers that petitioner had performed an abortion on her. She was taken, about 2 a. m., to the county hospital. There she was in great pain. Dr, Anton examined her and from the condition of her uterus concluded that she had an induced threatened abortion and perimetritis. He attempted to preserve the pregnancy since he felt that it was only threatened. She remained in the hospital about a week and was then discharged, as Dr. Anton concluded that the threatened abortion had subsided. After returning home she had a severe hemorrhage and returned to the hospital a day and a half later. Dr. Anton then diagnosed her condition as inevitable abortion. She was discharged a day or so later as the doctor concluded that she had completed her abortion. About a week later she started to hemorrhage again. A Dr. Nichols sent her to another hospital where he performed a curettement. Eleanor testified that later petitioner contacted her through her sister. Eleanor saw petitioner about three or four weeks before the hearing of the charges which the board had brought against him. He offered her a vacation if she would not testify. Her husband suggested that they "shake down" petitioner for $2,500. She met petitioner the night before the hearing and he offered her $500, the balance of $2,000 to be paid her after the hearing was over. Petitioner admitted this meeting but contended that Eleanor and her husband were the moving parties and that he was trying to trap them. Petitioner testified that when Eleanor first came to his office a Mrs. Gillian, who was working there to pay off a treatment bill, was there and that he treated Eleanor with Mrs. Gillian present in an adjoining office with the door open between. He claimed that he examined Eleanor to relieve "her low back pain and tenderness"; that he told her she looked as if she might be in the process of aborting; the cervix looked like it had been tampered with; that he refused her request to give her a treatment to cause her to lose her baby and that he did nothing to bring about an abortion. He claimed he charged her only $15, giving *244 her change from the total of the two checks. Mrs. Gillian substantiated petitioner's testimony as to his conversations with Eleanor at his office. Eleanor positively denied that Mrs. Gillian was there at all. Dr. Bashor, a specialist in obstetrics, gynecology and surgery was called by respondent. In answer to a hypothetical question based upon a history of the case given by petitioner's counsel he testified that in his opinion no abortion was performed in petitioner's office, that at most it was possible that there was an induction of an abortion. When additional facts as testified by Eleanor were added to the question, he testified that there was likelihood that an induction was performed and that the abortion followed subsequently.
 Petitioner's Contentions.
 [3a] 1. Petitioner contends that there was no evidence to show that at the time Eleanor was in petitioner's office she was pregnant and that petitioner knew that fact. This contention overlooks the fact that Dr. Wynekoop testified that in his opinion she was pregnant and that he told her so, petitioner's testimony that Eleanor told him that she believed herself to be pregnant, and petitioner's own diagnosis that she looked "as if she might be in the process of aborting."
 [4] Petitioner's claim of failure of proof of pregnancy is based on his erroneous contention that the board was required to prove pregnancy in order to substantiate the charge against petitioner. He quotes section 274 of the Penal Code as it read prior to 1935, when it was amended taking out the word "pregnant." Now proof of pregnancy is not required to establish guilt of the crime of abortion. "Proof of pregnancy not necessary. Since the amendment to section 274 of the Penal Code in 1935, it has not been necessary to prove that the woman on whom the operation was performed was pregnant at the time of the commission of the offense. (Rinker v. State Board of Medical Examiners, 59 Cal.App.2d 222, 224 [138 P.2d 403, 405]; People v. Emery, 79 Cal.App.2d 226, 231 [179 P.2d 843].) The performing of the operation with the intent on the part of the accused person to produce or procure a miscarriage constitutes the offense even though the woman on whom the operation is performed is not in fact pregnant." (People v. Ramsey, 83 Cal.App.2d 707, 717 [189 P.2d 802].) [3b] Although unnecessary to its decision the trial court found that Eleanor was pregnant and that fact was known to petitioner. The evidence supports this conclusion, even though petitioner made no tests for pregnancy. *245
 2. There is no evidence to support the finding that petitioner performed and agreed to perform acts with the intent to procure a miscarriage. This contention ignores entirely Eleanor's testimony that she asked petitioner to abort her, that he said he would and that thereupon he performed acts which eventually brought about the abortion. While she saw no knife she felt something cutting like a knife. While there was evidence from which the board might have determined that Eleanor's abortion was self-inflicted, her testimony of what occurred at petitioner's office is substantial evidence of an induction of an abortion having occurred there. In fact, under all the circumstances, the weight of the evidence is more in favor of the latter cause. Dr. Bashor's expert testimony did not rule out the possibility or even the probability that the abortion was induced by petitioner.
 [5] 3. The board abused its discretion in deciding the case on Eleanor's testimony and disregarding that of petitioner and Mrs. Gillian. As to this, the board saw the witnesses. Their credibility was for the board to determine, not for us. There was nothing inherently improbable in Eleanor's testimony. It is true that Eleanor and her husband attempted to extort money from petitioner. However, petitioner's meeting with Eleanor with, as he claims, marked bills which he was going to give her (but which he did not), with only his wife and a friend as witnesses, and the circumstances of that meeting, even under his own testimony, were such as to be more consistent with his having done something illegal to Eleanor, than with his version of his treatment of her. Petitioner testified that Eleanor had told him that the board's investigator had urged her to testify against him and had told her that if the board found petitioner guilty her husband could sue petitioner for damages. Undoubtedly the board had in mind any pecuniary advantage Eleanor or her husband might derive from a conviction, and considered it in weighing her testimony. However, we cannot say that the extortion incident and her pecuniary interest required the board to disregard her testimony.
 Petitioner states baldly that the board refused to consider the "extortion plot." There is nothing in the record to support this statement. Petitioner at considerable length brought out the facts which showed that Eleanor's husband conceived the plan of extorting $2,500 from petitioner. The evidence was before the board and it no doubt considered it. While the husband's actions were reprehensible, as were *246 Eleanor's, in being willing, as she apparently was, to accept money from petitioner, neither fact would justify the board in excusing petitioner from his unprofessional conduct. These facts must be viewed in weighing the credibility of the witnesses. There is no indication that the board did not so weigh them.
 The Sylvia Case.
 [6] Petitioner admitted administering and prescribing the drugs but contended that they were administered as an emergency treatment for an acute infection endangering her life. Section 2144 of the Business and Professions Code provides that the inhibition against a drugless practitioner administering or prescribing drugs does not prohibit "service in the case of emergency." Petitioner testified that he went to see Sylvia at the request of her friend, Mrs. Adams, who told him that Sylvia had aborted herself; that she showed him the fetus of twins. He then examined Sylvia. She seemed to be in good condition except that she was "run-down looking." He externally palpated her abdomen but prescribed no drugs. Three days later Mrs. Adams called him, saying that Sylvia was running a temperature. Mrs. Adams had attempted to remove from Sylvia's vagina the "secundines." Petitioner saw Sylvia. She had a temperature, and he suspected puerperal infection, sepsis due to Mrs. Adams' action. Petitioner called several doctors, but as it was Saturday afternoon, getting late, he could not get any doctor. Later Mrs. Adams phoned petitioner that Sylvia was getting worse, her temperature had increased. Petitioner then went to a drugstore, procured a hypodermic syringe and posterior pituitrin and sulfadiazine tablets. He asked Sylvia to go to the county hospital. She refused. Her temperature was between 103 and 104, so he gave her the pituitrin and the sulfadiazine. It was his opinion that her condition was such as to require emergency treatment. Also it was required because she was uncooperative, saying she would rather die than go to the county hospital.
 Petitioner contends that as his testimony was not controverted by any witness there is nothing to refute his statement that an emergency existed. However, the board was not required to believe petitioner's story, particularly in view of the circumstances as he explained them. On his first call on Sylvia he found that she had aborted herself, that she was bleeding from the vaginal canal. He made no suggestion that a doctor (an M.D.) be called to treat this condition, *247 which obviously would continue. His conduct in not doing so, coupled with his failure to call the hospital or the California Osteopathic Association for a doctor, in spite of his claim that he spent an hour trying to get a doctor (he did talk to a Dr. Hagin although it does not appear what the talk was about, what kind of a doctor Dr. Hagin is, or whether he was asked to attend Sylvia) justifies a reasonable inference that he purposely neglected advising that an M.D. be called. Thus, if infection occurred or drugs were necessary he could contend that an emergency existed and he could then administer drugs. Moreover, a reading of petitioner's testimony raises a very real doubt that an emergency actually existed. Petitioner seemed to be more concerned with Sylvia's uncooperativeness than with her physical condition. He contends that the circumstances of this charge are similar to those in Moran v. Board of Medical Examiners, supra (32 Cal.2d 301), where the trial court held that the weight of evidence showed that the doctor against whom the charges of improper prescribing of narcotics were brought, had done so as emergency treatments. There is no similarity between the facts of that case and those here. Although there, there was a conflict in the evidence, the evidence showing that emergencies existed was strong. Contrary to the situation here, the trial court found in petitioner's favor. The reviewing court pointed out that it was bound by the rule that if the evidence viewed in the light most favorable to the trial court's decision sustains that court's findings, the reviewing court must affirm. We are bound by the same rule.
 2. Was Petitioner Denied a Fair Hearing?
 [7] In his petition for reconsideration petitioner, for the first time, contended that Dr. Cayler, the secretary and one of the members of the board, was unfair-minded and unduly prejudiced against petitioner. This charge was based upon the claim that petitioner, as an active member and officer of the California Osteopaths, had endeavored since 1942 to bring about an amendment to the Business and Professions Code to permit osteopaths to take an examination to qualify them as medical physicians and surgeons; that during that period Dr. Cayler opposed such legislation; that petitioner and Dr. Cayler had been in violent disagreement on the subject, and that petitioner had pointed out publicly that Dr. Cayler had broken his promised word concerning the matter. Attached to the petition are certain letters showing petitioner's *248 interest in the legislation and his activities concerning it, and Dr. Cayler's position and opposition. While these letters show opposition by Dr. Cayler to the legislation and indicate that possibly Dr. Cayler had unduly delayed the restoration to petitioner of his license when, on a former occasion, petitioner had been acquitted of a charge of unprofessional conduct, there is nothing in them to show any prejudice of Dr. Cayler towards petitioner or hostile action by him at the hearing. Nor is there any basis for petitioner's contention that the board was prejudiced against him and did not give him a fair hearing. At the end of the first hearing the board found petitioner guilty. Petitioner filed a petition for writ of mandate in the superior court. This writ was granted and the court ordered the board to set aside its decision and to receive additional expert evidence. At that time petitioner knew that Dr. Cayler was one of the board who had found him guilty, yet, without any objection to Dr. Cayler's presence, petitioner proceeded before him with the second hearing. At no time during either hearing did petitioner avail himself of the provisions of section 11512 of the Government Code, which provides machinery for the disqualification of a board member. His failure to do so bars him from raising the matter after the hearing was concluded and decided. It is not clear from the record whether the trial judge considered the allegations of the petition for reconsideration. Whether he did or not, the fact that petitioner did not see fit to question Dr. Cayler's right to sit in his case until a second adverse decision was made would justify a disregard of the unproved allegations of the petition.
 3. Dismissed Charges.
 [8a] No evidence was offered on the charges concerning alleged abortions on Sylvia and Dolores. The board dismissed these charges without prejudice. Petitioner moved that they be discharged with prejudice. This motion the board denied. Petitioner contends that it thereby abused its discretion. He presents no authorities to support his position. He cites McPheeters v. Board of Medical Examiners, 103 Cal.App. 297 [284 P. 938], on the contention that the Medical Practice Act, as it relates to punishment for unprofessional conduct, is penal in its nature. We know of no requirement that the dismissal, under the circumstances here, must be with prejudice. Murphy v. Board of Medical Examiners, 75 Cal.App.2d 161, holds (pp. 166-167 [170 P.2d 510]): "The proceeding here involved is an administrative, *249 disciplinary proceeding, and is not criminal in its nature, nor is it to be judged by the legal standards applicable to criminal prosecutions. [9] In the late case of Webster v. Board of Dental Examiners, 17 Cal.2d 534 [110 P.2d 992], our Supreme Court states the rule at pages 537, 538 and 539. 'Appellant first challenges the order of suspension on the theory that administrative proceedings to revoke a professional license are quasi- criminal in nature. ... This analogy between a proceeding to revoke a license and a criminal trial is found in a number of the earlier cases. In some of the decisions, however, language describing the revocation of a license as penal in nature is entirely inapplicable to an administrative proceeding brought for that purpose, because in the particular case the legislature had provided for forfeiture of the professional license as an extra penalty to be added to the criminal court after a conviction for violation of the statute ..."
 " 'Where, on the other hand, the legislature has created a professional board and has conferred upon it power to administer the provisions of a general regulatory plan governing the members of the profession, the overwhelming weight of authority has rejected any analogy which would require such a board to conduct its proceedings for the revocation of a license in accordance with theories developed in the field of criminal law ...' "
 [8b] Whether the board will again file the same charges is problematical and if it does the question of whether or not petitioner has been injured by the delay could then be determined. We find no abuse of discretion.
 The judgment is affirmed.
 Peters, P. J., and Wood (Fred B.), J., concurred.