[Civ. No. 20721.   Second Dist., Div. Two.   Feb. 7, 1956.]

A. RICHARD MAST, Appellant, v. STATE BOARD OF OPTOMETRY et al., Respondents.

Gomer & Himmelfarb, Newell & Chester and Newell, Chester & Gibson for Appellant.

Edmund G. Brown, Attorney General, and Edward M. Belasco, Deputy Attorney General, for Respondents.

FOX, J.—Petitioner brought this mandate proceeding to set aside the order of respondent board revoking his license to practice optometry.

An accusation was filed with the board charging petitioner with three counts of unprofessional conduct, viz: (1) employment of "cappers" or "steerers" to obtain business (Bus. & Prof. Code, § 3100); (2) obtaining fees by fraud or misrepresentation (Bus. & Prof. Code, § 3101); and (3) payment of unearned rebates as inducement for referring patients (Bus. & Prof. Code, § 650). Following hearing, the board found petitioner guilty on all counts and ordered his

license revoked. Upon a review of these proceedings the trial court found there was insufficient evidence to sustain the board's findings that petitioner had violated sections 3100 and 3101 of the Business and Professions Code. The court, however, sustained the board's finding that petitioner had violated section 650, Business and Professions Code,[1] and thereupon denied a peremptory writ of mandate. It is from this judgment that petitioner appeals.

The record[2] reveals that petitioner was licensed to practice optometry in California in 1943. He established offices in San Jose, Oxnard, Riverside, Brawley and San Bernardino. It is his activities in connection with the latter office that are here under review.

Raymond N. Roth, a lieutenant in the United States Air Force, was assigned to duty at Norton Air Base, which is in the vicinity of San Bernardino, from June, 1951, to the date of the hearing before the respondent board in May, 1953. He was the only optometrist at the base. Petitioner became acquainted with Lieutenant Roth in July, 1951. He also knew Lieutenant Roth's wife, Audrey. Petitioner advised Roth that he was interested in securing optometrical work from the base, and, according to his testimony, he was willing to give a 30 per cent discount. Petitioner provided Lieutenant Roth with boxes and his professional envelopes for use in transmitting prescriptions. Lieutenant Roth, in sending patients to petitioner from the base, prepared referrals for refractions marked ''Referred to Dr. A. R. Mast, 509 'E' Street, San Bernardino,'' signed ''R. N. Roth.'' The patients brought these signed referrals to petitioner's office, hence by this procedure petitioner knew which patients had been referred by Lieutenant Roth. Mrs. DeRosie, who was employed by petitioner as receptionist, bookkeeper and record keeper, initially received these referrals. One of her principal duties was handling referrals of patients from the Norton

---

[1]Section 650, Bus. & Prof. Code, reads: ''The offer, delivery, receipt or acceptance, by any person licensed under this division of any unearned rebate, refund, commission, preference, patronage dividend, discount, or other unearned consideration, whether in the form of money or otherwise, as compensation or inducement for referring patients, clients, or customers to any person, irrespective of any membership, proprietary interest or co-ownership in or with any person to whom such patients, clients or customers are referred is unlawful.''

[2]On appeal the evidence is viewed in the light most favorable to the successful party in the trial court. (*Kendall* v. *Board of Osteopathic Examiners,* 105 Cal.App.2d 239 [233 P.2d 107].)

Air Base. Roth "was in contact with the office constantly." He reported, at one time that people were complaining that they were being overcharged and that such complaints had reached the Adjutant General's office and that office was "getting suspicious." He arranged a conference with petitioner to discuss the matter.

In petitioner's office, the air base business was kept separately on report sheets. Also, under Dr. Mast's orders, a separate bank account was set up for this business.

Petitioner conducted his San Bernardino office personally during July and August, 1951, but on September 4, 1951, he employed Dr. Arthur Harris, an optometrist, to do the optometry work in this office. Such arrangement continued until the middle of October, 1952, when differences arose between the parties over the amount of compensation to which Dr. Harris was entitled. The relationship was thereupon terminated. During this period petitioner was in the San Bernardino offices only a few days each month.

In discussing this referral business, petitioner stated to Dr. Harris that "he had 25 percent advertising costs at the Air Base . . ." He declined, however, to explain what he meant by "advertising costs." Petitioner told Mrs. DeRosie that "it was costing him 25 percent to get the business from the base." On another occasion he told her "he was paying Lt. Roth 25 percent to get the business."

Six checks signed by petitioner and payable to Audrey Roth, wife of Lieutenant Roth, were introduced in evidence. These covered a period from August 2 to October 15, 1951. They ranged from $17.23, the amount of the first, to $68.44, the face of the last. Petitioner, however, claims these checks were in payment for services rendered on an hourly basis by Mrs. Roth in connection with his advertising program, she assertedly having had some experience in preparing advertising copy. The only specimen of her work that was offered in evidence was a pencil draft of a proposed newspaper advertisement 2x3¼ inches, announcing the opening of petitioner's San Jose office, together with another sheet containing 16 lines relative to advertising media. It does not appear, however, that this material was used. While petitioner's bookkeeper testified that Mrs. Roth acted as petitioner's advertising consultant, she did not render any services at the San Bernardino office. No record was offered to show the number of hours she worked per day or per week; no bill was submitted for services rendered. The

checks were drawn in favor of Mrs. Roth by the bookkeeper in such amounts as either petitioner or Mrs. Roth requested. A withholding statement appears to have been prepared.

Although Lieutenant Roth and his wife were called as witnesses and admitted acquaintance with petitioner, they both refused to answer upon constitutional grounds all questions concerning their dealings with or relationship to him.

There was received in evidence, over petitioner's objections, Exhibit 29, which is an affidavit by Lieutenant Roth, subscribed and sworn to before a deputy attorney general of California on March 3, 1953, reading as follows:

"Norton Air Force Base
San Bernardino, California
March 3, 1953

"I, RAYMOND N. ROTH, 1st Lt. AO 962907, Hq 2796th Medical Group, USAF Hospital, Norton AFB, hereby give the following written statement freely and voluntarily without promise of any reward or immunity, with full realization that said statement may be or will be used at a hearing to be held before a hearing officer of the State of California in and for the State Board of Optometry, or at any deposition necessarily set or required under the aforementioned hearing.

"Shortly after my arrival after being assigned to Norton AFB, San Bernardino, Calif., in the latter part of the month of June 1951, I first met Dr. A. R. Mast, having been asked by a mutual friend, a Dr. E. M. Lubow, at Dayton, Ohio, a schoolmate of Dr. Mast's, to say hello. We met socially on many occasions and during one of these occasions Dr. Mast broached the subject of a referral fee for patients referred for corrective spectacles. I believe the referral fee was, as I remember, 10% of the gross in each case. The period in which this was continued was from approximately September 1951 until September 1952. Originally payment was made in the form of employment for my wife, and later this was discontinued. This was a nominal employment. Later this practice was discontinued and direct payments were made to my wife. The payments were approximately $80 to $90 every month.

"I discontinued receiving any payment from Dr. Mast after September of 1952.

I, RAYMOND N. ROTH, have read the foregoing statement and I hereby state that it is my own.

(Signed) Raymond N. Roth"

On June 30, 1953, Roth executed another affidavit, Exhibit O, in which he asserted the above affidavit of March 3, 1953, "was obtained under duress by reason of promises of immunity, undue influence, and intimidation" and that he was under medical care and did not realize what he was signing.

William J. McMahan, Special Agent for the United States Air Force, testified the signature of Lieutenant Roth to Exhibit 29 was not obtained by duress; that no promise of immunity was offered; neither were any threats made, nor any coercion exercised. He further testified that Lieutenant Roth was in uniform and did not appear to be ill.

Gene S. Boaz, Special Agent, 18th District Office of Special Investigation, Norton Air Base, testified to a conversation with Mrs. Roth, in the presence of her husband, in which she stated that she had never been employed by Dr. Mast for any particular work, that she was merely placed on the payroll as a means to convey a percentage or referral fee that was promised by Dr. Mast to her husband for referring patients from Norton Air Base to his optometry office in San Bernardino. Special Agent Boaz also testified that Roth told him Dr. Mast had offered him 10 per cent of the gross business that he referred to Mast's office and that this amounted to approximately $1,500 over the period September 1951 to September 1952.

The trial court found, after exercising its independent judgment on all the evidence, that petitioner did violate the provisions of section 650, *supra*, in the following manner: "That in or about the month of July, 1951, the [petitioner] and said Roth entered into an oral agreement whereby the said Roth would refer military personnel or their dependents from the Norton Air Base to the [petitioner's] offices, located at 509 E Street, San Bernardino, California, for optometrical services, and that in consideration of said Roth so referring military personnel or their dependents to said [petitioner] for optometrical services, the [petitioner] would pay said Roth for said referrals; that it was further agreed between the [petitioner] and said Roth that the payment for said referrals would not be made directly to said Roth, but that said payments would be made to Audrey Roth, the wife of said Roth; that pursuant to said oral agreement, said Roth did refer, during the period from July, 1951, to in or about September, 1952, military personnel and their dependents from the Norton

Air Base to the [petitioner's] office for optometrical services, and that [petitioner] did furnish optometrical services to said military personnel and to dependents of said military personnel and did receive from said military personnel and said dependents of said military personnel payment for said optometrical services, and that said [petitioner] did pay, during the period from in or about July, 1951 to on or about October 15, 1951, a consideration in cash to said Audrey Roth for the referrals of military personnel and dependents of military personnel to [petitioner] for optometrical services. That said payments to said Roth and Audrey Roth were consideration for the referrals of military personnel and the dependants of military personnel to [petitioner] for optometrical services and were not for the optometrical services of any nature rendered by said Roth or wife."

█ Petitioner's first contention is that "the findings of fact are not supported by the evidence." This contention is lacking in merit.

Petitioner's solicitation of Lieutenant Roth for the optometrical work from the air base; his furnishing of office supplies to facilitate the referral of such business; Lieutenant Roth's identification of the referrals by his signature; the substantial number of such referrals; the segregation of the business from the air base on separate report sheets; the maintenance of a separate bank account for the money coming from this segment of petitioner's business; the constant contact Lieutenant Roth maintained with petitioner's office; petitioner's admissions that he had to pay for the business from the air base; the checks made to Mrs. Roth; her admissions to Special Agent Boaz of the Norton Air Base; the affidavit of Lieutenant Roth subscribed and sworn to before a deputy attorney general; and the reasonable inference that may be drawn from this evidence furnish substantial support of the court's finding to the effect that petitioner and Roth entered into an agreement by which the latter would refer military personnel and their dependents from Norton Air Base to petitioner's office in San Bernardino for optometrical services and that petitioner would and did pay Roth therefor by making such payments to his wife, Audrey. Having determined that there is substantial evidentary support for the findings, we need not, as a reviewing court, go further on this phase of the case. (*Kendall* v. *Board of Osteopathic Examiners,* 105 Cal.App.2d 239 [233 P.2d 107]; *Ashdown* v. *State,* 135

Cal.App.2d 291 [287 P.2d 176] ; *Webster* v. *Board of Dental Examiners,* 17 Cal.2d 534, 539 [110 P.2d 992].)

Appellant points out that the Roth affidavit (Exhibit 29) is hearsay. He then proceeds to argue (a) that it was "improperly admitted into evidence" and, (b) that this affidavit was the "only evidence" regarding any agreement between petitioner and Lieutenant Roth, and that since it is hearsay it "is insufficient to support a finding of fact." ▮ Petitioner relies on Government Code, section 11513, subdivision (c).[3] The statute, however, does not support his conclusions in the circumstances here present. First, it will be noted that technical rules of evidence need not be observed in administrative hearings. The section then provides that "Any *relevant* evidence shall be admitted *if it is the sort of evidence on which responsible persons are accustomed to rely in the conduct of serious affairs,* regardless of the existence of any common law or statutory rule which might make improper the admission of such evidence over objection in civil actions." (Emphasis added.) Thus hearsay evidence is *admissible* in an administrative hearing if (1) it is relevant, and (2) it is of the character or quality on which "responsible persons are accustomed to rely in the conduct of serious affairs." The affidavit of Lieutenant Roth meets both of these tests of admissibility. It was clearly relevant for it dealt with the relationship between him and petitioner which had been established by reason of the referrals, and the relationship between petitioner and Mrs. Roth which had been revealed by the checks she had received from him. The affidavit of Lieutenant Roth obviously meets the second requirement for admissibility, for it is not only in affidavit form but is subscribed and sworn to before a responsible state official. This is the sort of information on which "re-

---

[3]Government Code, section 11513, subdivision (c), reads: "The hearing need not be conducted according to technical rules relating to evidence and witnesses. Any relevant evidence shall be admitted if it is the sort of evidence on which responsible persons are accustomed to rely in the conduct of serious affairs, regardless of the existence of any common law or statutory rule which might make improper the admission of such evidence over objection in civil actions. Hearsay evidence may be used for the purpose of supplementing or explaining any direct evidence but shall not be sufficient in itself to support a finding unless it would be admissible over objection in civil actions. The rules of privilege shall be effective to the same extent that they are now or hereafter may be recognized in civil actions, and irrelevant and unduly repetitious evidence shall be excluded."

sponsible persons are accustomed to rely in the conduct of serious affairs."[4]

The next sentence relates to the *use* that may be made of admissible hearsay. The section provides that "Hearsay evidence may be used for the purpose of supplementing or explaining any direct evidence . . ." In the instant matter there was direct evidence of referrals of military personnel from the air base by Lieutenant Roth to petitioner, and there was direct evidence of payments by petitioner to Lieutenant Roth's wife. Lieutenant Roth's affidavit served to supplant this direct evidence and to explain the relationship between the parties. Its use was thus plainly within the provisions of the statute.[5]

In this connection, petitioner points to the provision of the statute that hearsay "shall not be sufficient in itself to support a finding unless it would be admissible over objection in civil actions." He then insists that the Roth affidavit is the only evidence of an agreement between the parties for a rebate. Hence, he argues, the finding, quoted *supra,* is lacking in requisite evidentiary support. In making this argument petitioner overlooks the fact that in addition to the direct evidence of referrals and payments to Mrs. Roth there was also significant indirect evidence before the board and the court. The testimony that petitioner had stated he was having to pay to get the business from the air base, and in particular that he was paying Lieutenant Roth a certain percentage for such referrals, was before the triers of the facts. There was also testimony that a separate list of the referrals from the air base was kept on report sheets and that a separate bank account was established for this business. Without enumerating additional circumstances or the inferences that may be drawn reasonably from other testimony, it is patent that the challenged finding is not based solely on hearsay but rather upon both direct and indirect evidence and the reasonable inferences therefrom as well as on admissible hearsay.

---

[4]While petitioner does not specifically complain of the receipt in evidence of Mrs. Roth's hearsay admission, it clearly fails in the same pattern as does Lieutenant Roth's affidavit. Her statement was relevant because it dealt with the relationship between her and petitioner which had been disclosed by the checks she had received from him. It was made in her husband's presence to a special agent of the Air Force. Responsible people would undoubtedly rely on information so acquired in the conduct of serious affairs.

[5]The same reasoning, with the same result, applies with equal force to the use of the hearsay admission of Mrs. Roth.

∴

Petitioner argues there was no competent evidence to contradict the testimony that Mrs. Roth was employed to and did perform advertising services for him and that his payments to her were for such services. Hence, such testimony should have been accepted. In making this contention petitioner is actually arguing the credibility of the witnesses and the weight to be given to the evidence. That function is, of course, for the triers of the facts. In evaluating petitioner's testimony they were entitled to take into consideration his personal interest in the outcome of these proceedings. Furthermore, the circumstances, as herein briefly noted, surrounding the asserted rendition of advertising services for petitioner were not such as to command confidence in the story of petitioner and his bookkeeper. The triers of fact were not required, as a matter of law, to give credence to this testimony. There was evidence from which contrary inferences could be drawn. ▮▮▮ It is well settled that a reasonable inference from indirect or circumstantial evidence may be accepted as true as against direct evidence to the contrary. (*Bohn* v. *Watson,* 130 Cal.App.2d 24, 34 [278 P.2d 454] and cases there cited.)

Petitioner asserts he was denied the qualified trial de novo to which he was entitled in a mandamus proceeding to review the administrative determination of a statutory agency exercising statewide jurisdiction. He predicates this argument on the trial court's refusal to allow him to call Mrs. DeRosie and Dr. Harris ''for further cross-examination and impeachment.'' He relies on the following language from *Dare* v. *Board of Medical Examiners,* 21 Cal.2d 790, 799-800 [136 P.2d 304] : ''If the credibility of witnesses before the board be brought in question in the mandamus proceeding the opportunity should be afforded for further examination or to contradict or impeach their testimony under well recognized rules of evidence and procedure.'' In arguing this point before the trial court, Mr. Gomer, petitioner's counsel, stated he wished to cross-examine Mrs. DeRosie as to the number of times she talked with Dr. Mast, claiming he was prevented from pursuing this inquiry by the hearing officer. However, Mr. Gomer conceded this had been answered by Mrs. DeRosie with the statement ''I don't recall.'' Mr. Gomer then stated: ''Now, I don't know if anything relevant would come from such a cross-examination . . . maybe she does not recall, but I say that is evasive tactics.'' Mr. Gomer, in stating

he wanted to question Mrs. DeRosie further relative to sales of frames to civilians, said he was not satisfied with her evasive answers at the hearing. He then observed: ''Naturally, she may come back on the stand and still say, 'I don't recall; I don't recall; I don't recall,' and nothing will come of this examination.'' Other references were made by Mr. Gomer to what he considered vague testimony by Mrs. DeRosie. He made no offer to show that any other or different testimony would be given by Mrs. DeRosie or that her memory of past events would be better at the mandamus hearing than it was at the administrative hearing. It is patent that he expected the same responses from Mrs. DeRosie, and hoped primarily that the court would give little credit to her testimony after observing her demeanor. The court refused to sanction a reiteration of the testimony, observing that the opportunity to impeach had been given at the time of the hearing and there was no showing that a source of impeachment not then available could now be produced and directed against the witness.

The court's ruling was sound and within the legitimate bounds of its discretion. (Code Civ. Proc., § 1094.5, subd. (d).) The record shows that petitioner was given ample opportunity to impeach Mrs. DeRosie by the hearing officer. He was curtailed only when he sought to employ improper impeachment methods or when he persisted in asking questions which had already been answered to the best of the witness's ability, though not to his satisfaction. The weight to be given her testimony was for the trial court in its independent review of the record. ▆ A mere attack on the credibility of a witness does not entitle a party, in the mandamus action, to call that witness for further examination and impeachment unless a showing is made to the satisfaction of the trial court that he was unreasonably foreclosed from proceeding with his impeachment at the original hearing or that he has available new impeaching evidence which he could not with reasonable diligence have produced before the board. (See Code Civ. Proc., § 1094.5, subd. (d) ; *Sautter* v. *Contractors' State License Board,* 124 Cal.App.2d 149, 154 [268 P.2d 139].) The language previously quoted from *Dare* v. *Board of Medical Examiners, supra,* when read in the light of the issue before the court and in conjunction with the several sentences immediately preceding it, harmonizes perfectly with the view here expressed. For it was the essential purpose of the Dare case, and of Code of Civil Pro-

cedure, section 1094.5, which was enacted subsequent to the Dare case and codified the procedures developed by the cases for reviewing adjudications of statutory statewide administrative agencies, to preserve the dignity and integrity of the proceedings before the administrative tribunal and to avoid a pointless repetition upon the limited trial de novo of the evidence presented before the administrative board. Where, as here, the witnesses in question had been subjected to a searching examination by petitioner at the hearing, where ample opportunity had been offered therein to impeach their testimony, and where it affirmatively appears from the discussion of counsel that he did not expect to elicit anything from the witnesses beyond that already in the record, the trial judge does not abuse his discretion in refusing to permit further testimony from such witnesses, the effect of which would be an encumbrance of the record with redundant matter. (*Sparks* v. *Board of Dental Examiners*, 54 Cal. App.2d 491, 494-495 [129 P.2d 405].) This being the situation in the case at bar, the ruling of the court was in full concord with the letter, spirit and purpose of the limited trial de novo provided by mandamus proceeding for judicial review of the action taken by a statutory statewide agency.

Petitioner charges the hearing officer was guilty of misconduct, which prevented him from having a fair and impartial hearing. In support of this charge he recites nine instances in his brief which he asserts show bias, prejudice and misconduct on the part of the hearing officer. The trial judge was called upon to evaluate these incidents. He found as a fact that the hearing officer did not act arbitrarily or capriciously and did not commit any abuse of discretion.[6] We have examined these various assignments and find no basis for disagreeing with the trial court's evaluation thereof. To detail and discuss each of these incidents would serve no useful purpose.

Petitioner argues that the accusation is insufficient to advise petitioner of the "nature of the conduct asserted to be improper." There is no merit in this contention.

Paragraph IV of the accusation states: "That the respondent has been guilty of unprofessional conduct in that he has

---

[6]This matter was also covered in the conclusions of law in the following language: "That the hearing officer did not act arbitrarily or capriciously, and did not commit any abuse of discretion in the conduct of said hearing or in the ruling upon objections."

violated the provisions of section 650 of the Business and Professions Code of the State of California at the time and in the manner as more particularly alleged in Paragraph III of this Accusation.''

Paragraph III of the accusation alleges: ''That Raymond N. Roth, First Lieutenant, 2769th Medical Group, USAF Hospital, Norton Air Base, at the times mentioned in this Accusation was not and is not now licensed to engage in the practice of optometry in the State of California by the State Board of Optometry;

''That in or about the month of July, 1951, the respondent and said Raymond N. Roth entered into an oral agreement whereby for the referral by Raymond N. Roth of military personnel or their dependents from Norton Air Base to Respondent's offices in San Bernardino, California, for optometrical services that said Raymond N. Roth would receive from respondent a 10% commission on the gross fee charged or collected for optometrical services by respondent from the referred military personnel or their dependents;

''That pursuant to the above-mentioned agreement between the respondent and Raymond N. Roth, from September, 1951, to September, 1952, Raymond N. Roth referred military personnel and their dependents for optometrical services to the respondent; that pursuant to their agreement the respondent paid to Raymond N. Roth or his wife, Audrey Roth, about $90.00 per month as said Raymond N. Roth's 10% commission for the referral of the above-mentioned persons to the respondent by Raymond N. Roth; and that said 10% commission paid to Raymond N. Roth was unearned consideration for the referral of the above-mentioned persons.''

Section 11503 of the Government Code provides in part: ''The accusation shall be a written statement of charges which shall set forth in ordinary and concise language the acts or omissions with which the respondent is charged, to the end that the respondent will be able to prepare his defense.''

A mere reading of the accusation demonstrates that it adequately advised petitioner of the ''nature of the conduct asserted to be improper'' and sufficiently acquainted him with the acts with which he was charged to enable him ''to prepare his defense.'' To require, as petitioner argues, that the accusation must state particular individuals were referred by Lieutenant Roth to petitioner at specific times, and that in return for such referrals Roth was paid specific sums at

specified times would be unreasonable and impractical in the circumstances here presented for such information as was available along these lines was in petitioner's files. We share the view of the trial judge that the accusation was in all respects sufficient.

■ Petitioner also argues that "the findings are insufficient to support a violation of section 650 of the Business and Professions Code. His theory is that the section was designed to prevent patients from being charged excessive fees in order that a "kickback" could be made to the licentiate who made the referral. He then argues that since there is no finding that petitioner charged the military personnel or their dependents who were referred to him by Lieutenant Roth a fee higher than that charged by him for other like services, he cannot be held to have violated the law. The statute is not so limited. It was designed to protect the public and to prohibit all unearned rebates, refunds, commissions and the like among licentiates engaged in the healing arts for the referral of patients. An excessive charge is not an element of the offense. The absence of such a finding is, therefore, wholly immaterial.

■ Petitioner's final contention is that the trial court erred in not remanding the matter to the board for reconsideration of the penalty. He argues that the board's order revoking his license was based on its finding and conclusions that petitioner had violated sections 3100, 3101 and 650 of the Business and Professions Code. Inasmuch as the court found there was no violation of sections 3100 and 3101, he asserts that it is questionable whether the board would have imposed so drastic a penalty as license revocation for a violation of section 650 alone, and hence the court should have referred the case to the board for reconsideration of the penalty.

This argument would be a compelling one if the state of the record admitted of any doubt as to whether the board would have exacted so severe a penalty for petitioner's violation of section 650 alone. It is now fully established that where an agency exercising statewide jurisdiction has imposed a single penalty based on multiple charges of misconduct, and the court holds some of them to be unsupported, the practice normally to be employed is to return the case to the administrative agency with a direction to reconsider the penalty to be imposed. (*Bonham* v. *McConnell,* 45 Cal.2d 304 [288 P.2d 502] ; *Cooper* v. *State Board of Medical Examiners,* 35 Cal.2d 242 [217 P.2d 630, 18 A.L.R.2d 593] ;

*Nelson* v. *Department of Corrections,* 110 Cal.App.2d 331, 335 [242 P.2d 906].) The rationale of this rule is contained in the Bonham and Cooper cases last referred to. In the Cooper case, *supra* (p. 252), the court pointed out that "the board made a single order of license revocation based on its findings and conclusions that both count seven and count nine had been violated. Inasmuch as we hold that the findings do not support the conclusion of unprofessional conduct as to count seven, and since license revocation is in any event a drastic penalty, and *furthermore, in consideration of the fact that we have no means of knowing whether the board itself would have imposed so severe a penalty for violation of count nine alone,* we are of the view that the judgment should be reversed with directions to the trial court to set aside the order and send the matter back to the board for reconsideration of the penalty." (Emphasis added.) In the Bonham case, the license of an insurance broker was revoked by the insurance commissioner after he made 15 findings that the broker was guilty of misconduct. The trial court found that three of the findings were not supported, upheld the other 12, and concluded that they sustained the commissioner's action. In remanding for reconsideration by the board, the Supreme Court pointed out that unless this were done, in the light of the fact that the court had found some of the charges to be unsupported, the commissioner would not be afforded an opportunity for an intelligent exercise of the statutory discretion reposed in him in accord with the exact degree of the licensee's derelictions. The court states (p. 306): "He [the Commissioner] should not be precluded from exercising his discretion either initially or where, as here, some of his findings of misconduct are upheld on judicial review and others are not. Where some of the findings are not supported by the evidence, *it is obvious that his discretion has been exercised under a misconception as to the extent of the licensee's misconduct."* (Emphasis added.)

The circumstances in the Cooper and Bonham cases do not parallel the case at bar in one vital feature. For here the board itself has supplied to the trial court and the appellate tribunal its view as to the penalty to be imposed for a violation of section 650, so that we have a "means of knowing whether the board itself would have imposed so severe a penalty for violation" of that section alone. And it has exercised its discretion not on the basis of a single order of revocation based on its collective findings but by segregating the findings

as to the several charges and designating the penalty appropriate to each violation. The board specifically found that petitioner had violated section 650 by offering and delivering an unearned consideration as compensation to Lieutenant Roth for the referral of patients to him and that "*for this violation alone,* respondent's [petitioner's] certificate of registration ought to be revoked." (Emphasis added.) The board made similar findings with respect to each of the other charges. It is unmistakable that the board intended to exact the penalty imposed on each count of the charges. (See *Genser* v. *State Personnel Board,* 112 Cal.App.2d 77, 88 [245 P.2d 1090].) It being clearly manifest that the board had exercised its discretion as to the appropriate penalty for the violation of section 650 alone, and that it had fully evaluated and assessed the gravity of the offense and the nature of the penalty warranted thereunder for the enlightenment of a reviewing court pursuant to the admonition of the Cooper case, the court below properly declined to remand the case for a reconsideration which the board's own foresight and anticipatory expression had rendered nugatory. In his closing brief petitioner states that he "does not dispute that the charge against him was serious." It was not an abuse of discretion for the board to order revocation of petitioner's license as the appropriate disciplinary action for such a serious offense.

The judgment is affirmed.

Moore, P. J., and Ashburn, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 28, 1956. Carter, J., was of the opinion that the petition should be granted.