[L.A. No. 31198. July 7, 1980.]

DONALD A. MILLER, Plaintiff and Appellant, v.
EISENHOWER MEDICAL CENTER, Defendant and Respondent.

616

**COUNSEL**

Volk, Newman, Marsh, Gralla & Karp, Bruce H. Newman and James H. Karp for Plaintiff and Appellant.

Weissburg & Aronson, Albert C. Mour, Carl Weissburg, Patric Hooper, Robert W. Lundy, Jr., and Douglas B. Schwab for Defendant and Respondent.

Hassard, Bonnington, Rogers & Huber, Howard Hassard, David E. Willett and A. Robert Singer as Amici Curiae on behalf of Defendant and Respondent.

**OPINION**

MANUEL, J.—Plaintiff Donald A. Miller, a licensed physician and surgeon, appeals from a judgment denying his petition for a writ of mandate sought to compel defendant Eisenhower Medical Center, a private, nonprofit hospital corporation, to grant him staff membership and privileges at its hospital facility.

The cause was submitted to the trial court on the transcripts of hearings before defendant's judicial review and appellate review committees as well as various letters and documents. The underlying facts, as appearing therefrom, were in substance as follows:

Plaintiff, a board certified family physician and a member of the American Academy of Family Physicians, has been practicing in Indio,

California since 1970. He first sought staff membership at the Eisenhower Medical Center, a private hospital in Palm Desert owned and operated by defendant, in 1971, but that application was subsequently withdrawn by him and he reapplied in 1972. After denial of the 1972 application he again reapplied in 1974. Again the application was denied, and plaintiff's subsequent request for a hearing pursuant to the medical staff bylaws was also denied as being untimely.[1]

In 1975, plaintiff again reapplied for medical staff membership at Eisenhower. Along with his application he submitted by letter the names of 25 physicians whom the medical executive committee of the hospital might contact for recommendations concerning his suitability for membership.[2] After soliciting comments from all of plaintiff's references,[3] the medical executive committee informed plaintiff that his application had been denied "on the basis of recommendations received from references furnished by you in your letter...."

Plaintiff thereupon made timely application for a hearing before the judicial review committee. (See fn. 1, *ante.*) He also requested copies of the recommendations upon the basis of which his application had been denied. He was provided with a compilation of the responses made to each question (see fn. 3, *ante*) but was denied the names of the physicians who had provided particular responses on the ground that confidentiality was necessary "[i]n order to maintain a viable application process,..."

At the hearing before the judicial review committee plaintiff appeared on his own behalf; the medical executive committee was rep-

---

[1]The bylaws provide that a hearing must be requested within 10 days of the notice of denial. Apparently plaintiff was not explicitly made aware of his right to a hearing or the requisite period for requesting it upon the denial of his 1974 application, although he was so informed following denial of the 1975 application which here concerns us. (See *Westlake Community Hosp. v. Superior Court* (1976) 17 Cal.3d 465, 477-478 [131 Cal.Rptr. 90, 551 P.2d 410].)

[2]Apparently this was a substantially greater number of references than was customarily submitted by applicants for staff membership. In response to a question at the subsequent judicial review committee hearing plaintiff indicated that in view of his previous rejections he had thought it prudent to provide references from all fields of medicine which were involved in his practice.

[3]The references were asked the following questions: (1) "How long have you known this physician?"; (2) "What are his professional capabilities?"; (3) "Please provide information on his competence as a physician"; (4) "Do you feel he would be an asset to our Medical Staff?"; and (5) "Comments."

resented by one of its members. The latter reported that plaintiff's references gave him "good support from the standpoint of your professional competence, your knowledge and [the] adequacy of your training" but that the committee felt that plaintiff "came up wanting" with respect to the opinions received on the question whether he would be an asset to the medical staff.[4] (See fn. 3, *ante.*) Plaintiff was permitted to present four medical doctors as witnesses on his behalf. All testified favorably regarding plaintiff's medical competence; each was of the opinion that plaintiff would be an asset to the medical staff. One indicated that he was sometimes "a little impetuous about things which he wanted to be done" concerning staff practices and procedures but that "in the long run most of these ideas were very constructive ideas." Another, responding to a question concerning possible areas of conflict in "interpersonal relationships" with others, stated that although he had heard "rumors" he had himself neither observed nor experienced any such conflicts. A third, characterizing plaintiff as "a controversial person," went on to explain that he had reference to his tendency to express himself quite forcefully and vigorously in the evaluation of the competence of another physician, for example, or the running of a medical institution.

Plaintiff was also questioned at this hearing regarding a number of other matters, including the circumstances surrounding his departure from an internship program at the Cook County (Illinois) hospital some 14 years earlier. Protesting that he had received no notice that the latter subject was to be a matter of concern at the hearing, and that therefore he was not prepared to provide an exact account of it, he nevertheless indicated that "a definite disagreement of some kind," the details of which he could not recall, had precipitated his departure from the program at Cook County Hospital and the resumption and completion of his internship at another institution.

The judicial review committee upheld the medical executive committee's decision, stating that its conclusion was based "upon the determination that sufficient doubt exists concerning Doctor Miller's

---

[4]Out of 22 responses to this question approximately 15 were favorable, some enthusiastically so. Of the seven remaining responses, four were clearly unfavorable. Two of these answered simply: "No." One answered: "Very *controversial person. Has been disruptive in other situations.*" One answered: "I have no knowledge of Dr. Miller's plans regarding [Eisenhower Medical Center]. I do have knowledge of several physicians whose feelings are that they would think not."

There were no adverse comments concerning plaintiff's professional capabilities or his competence as a physician.

ability to work with others as stated in Article III, Section 2 of the Medical Staff Bylaws."[5]

Plaintiff thereupon appealed the decision of the judicial review committee to the medical center's board of trustees (board), as provided in the bylaws.[6] He requested and was granted the right to be represented by counsel at the hearing and to present witnesses in his behalf. Prior to the hearing his counsel requested that he be provided with the names of those doctors who had provided the negative recommendations reflected in the compilation previously furnished to plaintiff. Counsel for the board, responding to this request, indicated that these names would not be disclosed for reasons of confidentiality. His letter also stated: "The basis upon which Dr. Miller has been refused admission to the Medical Staff was his failure to comply with Section 2(a) of the Medical Staff By-laws and in particular, his failure to document his good reputation and ability to work with others. The following facts were presented at the hearing or will be presented at the appellate review to augment the record. [¶] 1. The failure to disclose at the hearing the reasons for his termination from the internship at Cook County Hospital. This was withheld despite direct questions regarding this. [¶] 2. The reasons for the termination of the residency [*sic*] at Cook County Hospital which directly relate to the qualifications in Section 2(a). [¶] 3. The letter from Martin S. Gittleman, Administrator of Indio Community Hospital, regarding Dr. Miller's ability to work with others. [¶] 4. A letter setting forth gross inaccuracies which Dr. Miller wrote to the Compre-

---

[5]The indicated section provides in relevant part as follows: "Only physicians and dentists licensed to practice in the State of California, who can document their background, experience, training and demonstrated competence, their adherence to the ethics of their profession, their good reputation, *and their ability to work with others*, with sufficient adequacy to assure the Medical Staff and the Board of Trustees that any patient treated by them in the hospital will be given a high quality of medical care, shall be qualified for membership on the Medical Staff." (Italics added.)

[6]Article VIII, section 4 of the bylaws governs the time, grounds, and nature of appellate review by the board. Subsection d. thereof provides: "d. *Nature of Appellate Review.* The proceedings by the Board of Trustees shall be in the nature of an appellate hearing based upon the record of the hearing before the judicial review committee, provided that the governing body may, in its discretion, accept additional oral or written evidence subject to the same rights of cross-examination or confrontation provided at the judicial review committee hearing. Each party shall have the right to present a written statement in support of his position on appeal, and in its sole discretion, the Board of Trustees may allow each party or representative to personally appear and make oral argument. At the conclusion of oral argument, if allowed, the Board of Trustees may thereupon at a time convenient to itself conduct deliberations outside the presence of the appellant and respondent and their representatives. The Board of Trustees may affirm, modify or reverse the decision of the judicial review committee, or, in its discretion, refer the matter for further review and recommendation."

hensive Health Planning Association which included an intemperate assault on Eisenhower Medical Center.... [¶] 5. The existence of a sufficient number of negative comments or lack of comments on responses from Dr. Miller's references which indicate his inability to work and cooperate with others and, therefore results in his failure to meet Medical Staff requirements at the present time."

At the appellate review hearing two additional doctors were called by the medical executive committee. Each testified that plaintiff had a reputation for getting along poorly with his colleagues. One stated that he "creates dissension" and "has relatively few friends in the community," the other that he "does not get along with most members of the medical community." Neither, however, indicated that he had personally had any difficulty working together with plaintiff in the care of patients. Each of these doctors had had a prior business relationship with plaintiff: one had been associated with plaintiff in the ownership of a hospital and had particular objections concerning plaintiff's having contracted to run the emergency room at a competing hospital; the other had been associated with plaintiff in practice. Three of the four doctors who had testified in plaintiff's behalf before the judicial review committee gave substantially similar testimony at the appellate review hearing. Again none of these doctors had ever experienced any difficulty with plaintiff in mutual care of patients.

The matter of termination of plaintiff's 1961-1962 internship was also raised. A letter from the medical director of the Cook County Hospital was introduced; it was therein indicated that plaintiff had been asked to leave before the completion of his internship, which was subsequently completed at another hospital, "because he did not assume his responsibilities to the hospital and his patients." Apparently a second letter from the same party was also presented, this letter explaining that the circumstances of plaintiff's dismissal involved his taking an unauthorized one-week vacation.[7] Plaintiff was examined at some length by his own and opposing counsel concerning the details of the incident and his alleged inability to recall them at the judicial review committee hearing. Again he protested that he had been given no notice of any kind prior to the latter hearing that the matter of his internship was to be raised there or had been a matter of concern to the medical executive committee in its denial of his application.[8] He indicated that he had

[7]The second letter is not included in the record before us. Discussion occurring at the appellate review hearing, however, provides a clear indication of its contents.

[8]As indicated above, plaintiff had been advised that the medical executive committee had denied his application "on the basis of recommendations received from references

answered "to the best of my ability but...just couldn't recall the exact details" at that time, "[s]ince I hadn't known that it was a problem." Having refreshed his memory in the interim by means of contacting certain parties involved, he stated that he now had a vivid recollection of the matter and was fully prepared to respond to questions concerning it. He proceeded to do so.

The medical executive committee also introduced a letter which plaintiff had directed the preceding summer to the executive director of the Comprehensive Health Planning Association. In this letter plaintiff voiced strenuous objection to the granting of an application for more hospital beds by one of the area hospitals, suggesting at one point that opposition to the application had been silenced pursuant to a secret agreement between the subject hospital and the Eisenhower Medical Center to suppress relevant information. The letter also contained derogatory remarks concerning the establishment of the Eisenhower Medical Center.[9] Plaintiff was questioned extensively about this letter, his motivation for writing it, and the factual bases upon which its allegations were grounded. He conceded that certain statements contained within it might have been inaccurate or "presumptuous" but indicated that he had been upset at the time of its writing by what he perceived to be a plot to favor certain hospitals at one end of the Coachella Valley at the expense of another hospital having adequate bed space in Indio.

Following the hearing on March 12, 1976, plaintiff was informed by letter that the board had "determined that substantial evidence was produced, at both your Judicial Review Committee hearing and the hearing before the Appellate Review Committee of this Board, to support the previous conclusion of the Medical Staff that you do not meet

furnished by you in your letter...." He had also been advised by a subsequent letter furnishing him with a compilation of the references' responses that "[t]he Medical Executive Committee based its decision upon these recommendations."

[9] The letter closed on the following note: "Problems in our Valley started five years ago with the additional [sic] of Eisenhower Medical Center. As you will recall, in order to attempt to justify the need for those additional beds in our community, the millionaires who supported that project strictly as a tax gimmick, subscribed to Stanford University to perform a research project to establish the need for beds here. To their dismay, and as most of us already knew, the report stated frankly that there was no need for additional beds in our community, and advised those individuals to look to other geographic areas if they truly wanted to supply needed community medical services. Nevertheless, Medical Center was constructed, due to political and regional influence, and the quality and organization of medical care in our community was badly disrupted....There is no rhyme or reason to adding a single hospital bed in the Coachella Valley, and only because of the deliberate distortion, secret agreements and misrepresentations on which your original decisions were based, have those selfish powers proceeded thus far."

the requirements for membership on the Medical Staff of Eisenhower Medical Center. [¶] Therefore the Board of Trustees has affirmed the action of· the Medical Staff and denied your application for such membership."

On March 29, 1977, more than a year after the date of the aforesaid letter, plaintiff commenced the instant proceeding. The trial court concluded that the requirements for membership were rational and not arbitrary, capricious, or contrary to public policy; that all proceedings had been conducted in a manner comporting with fair procedure; that the rejection of plaintiff had not resulted from arbitrary or discriminatory motivation or conduct; that there was substantial evidence in support of the determination made; and that the defense of laches was applicable. Plaintiff appeals from the ensuing judgment denying the petition.

I

We first address the issue of laches.

■ As we pointed out in *Conti* v. *Board of Civil Service Commissioners* (1969) 1 Cal.3d 351 [82 Cal.Rptr. 337, 461 P.2d 617], the affirmative defense of laches requires unreasonable delay in bringing suit "plus either acquiesence in the act about which plaintiff complains or prejudice to the defendant resulting from the delay." (*Id.*, at p. 359, fns. omitted.) Prejudice is never presumed; rather it must be affirmatively demonstrated by the defendant in order to sustain his burdens of proof and the production of evidence on the issue. (*Id.*, at p. 361.) Generally speaking, the existence of laches is a question of fact to be determined by the trial court in light of all of the applicable circumstances, and in the absence of manifest injustice or a lack of substantial support in the evidence its determination will be sustained. (See *Rouse* v. *Underwood* (1966) 242 Cal.App.2d 316, 323 [51 Cal.Rptr. 437]; *Teixeira* v. *Verissimo* (1966) 239 Cal.App.2d 147, 158 [48 Cal.Rptr. 496]; see also *Concerned Citizens of Palm Desert, Inc.* v. *Board of Supervisors* (1974) 38 Cal.App.3d 257, 265-266 [113 Cal.Rptr. 338]; *McClung* v. *Saito* (1970) 4 Cal.App.3d 143, 152 [84 Cal.Rptr. 44].)

We have also suggested that in cases seeking review of an administrative decision there may be substantial reasons for supporting a finding of laches for delays "far less than" the period of the applicable statute of limitations. (*Conti, supra,* at p. 357, fn. 3; see also Deering, Cal. Administrative Mandamus (Cont.Ed.Bar 1966) § 8.5, pp. 125-127; *id.* (Cont.Ed.Bar Supp. 1977) §§ 8.5-8.5A, pp. 86-88.)

Plaintiff urges that the trial court's finding of laches lacks substantial support in the record. It is argued that even if the one-year-and-seventeen-day delay between the board's final decision and the commencement of suit be deemed unreasonable, the record offers no basis upon which the second element of the defense—i.e., either acquiescence on his part or prejudice to the defendant—could reasonably be found to exist. It is notable in this respect that, as indicated above, the matter was submitted solely on the administrative record; defendant made no effort to introduce evidence of acquiescence or prejudice.[10] The record contained nothing indicating acquiescence on plaintiff's part to the board's decision.

With respect to the matter of prejudice to the defendant, however, defendant calls our attention to provisions in the bylaws to the effect that all staff appointments are of one year's duration with reappointment subject to annual review through a process involving a report by the departmental chairman. These provisions, it is argued, are clearly intended to insure that all physicians admitted to the staff *currently* meet the standards for admission. Defendant concludes that plaintiff, by delaying more than a year before seeking judicial review of the board's decision, presented the court with an application and evidence which was necessarily "stale" and, as such, could not possibly form the basis for current admission. Thus, it is urged, prejudice clearly appears.

We do not agree. With respect to the application form itself, which is a part of the instant record, it appears that the form filled out by plaintiff at the time of his original application in 1971 was thereafter used by defendant as the basis of all subsequent applications—i.e., 1972, 1974, and the application here involved, 1975.[11] Insofar as matters *aliunde* the application form are to be considered, there is no showing made that members of the medical staff seeking reappointment are required to provide any new information or additional documents concerning their qualifications each year, nor is it suggested or offered to

[10]Plaintiff's failure to file a replication to the answer requires that all ultimate facts contained therein be accepted as true unless countervailed by proof. (See *Hunt* v. *Mayor & Council of Riverside* (1948) 31 Cal.2d 619, 623 [191 P.2d 426]; *Most* v. *First Nat. Bank of San Diego* (1966) 246 Cal.App.2d 425, 432 [54 Cal.Rptr. 669].) The answer's allegations concerning prejudice, however, were largely conclusory in nature and in any event were met by material in the administrative record.

[11]The application form specifically reflects the action taken upon it in 1972 and 1974, and its inclusion in the record at defendant's instance would indicate in the absence of any other similar form in the record that it was also utilized in the processing of the 1975 application.

be shown that any relevant changes have occurred in plaintiff's qualifications. The record reflects no recent alterations in the appointment process or in the situation regarding availability of staff positions. Defendant, in short, simply asks that we presume prejudice. This we may not do. The trial court's finding of laches, we conclude, is not supported by the evidence.

## II

Plaintiff, relying principally on cases such as *Rosner v. Eden Township Hospital Dist.* (1962) 58 Cal.2d 592 [25 Cal.Rptr. 551, 375 P.2d 431], *Martino v. Concord Community Hosp. Dist.* (1965) 233 Cal.App.2d 51 [43 Cal.Rptr. 255], and *Wyatt v. Tahoe Forest Hospital Dist.* (1959) 174 Cal.App.2d 709 [345 P.2d 93], argues that the standard for medical staff membership under which he was excluded (see fn. 5, *ante*) is so vague and uncertain as to provide a substantial danger of arbitrary or discriminatory application, and that it must therefore be held invalid. Recognizing that the cited cases have involved public rather than private hospital institutions, he urges that their teaching must be applied in the case of private hospitals as well to preclude the adoption of standards for admission to staff membership whose terms are unreasonably susceptible of arbitrary or discriminatory application. The standard here in question, he argues, suffers from just this vice.

We agree—and indeed we do not understand defendant to do otherwise—that even a private hospital institution may not adopt rules for the admission to staff membership which permit exclusion on an arbitrary or irrational basis. As we have stated in a similar context, "[i]n addition to requiring a fair procedure, the common law decisions establish that expulsion from an association cannot properly rest upon a rule which is substantively capricious or contrary to public policy." (*Pinsker v. Pacific Coast Society of Orthodontists* (1974) 12 Cal.3d 541, 553 [116 Cal.Rptr. 245, 526 P.2d 253].) A similar rule is applicable to private hospitals. (See *Willis v. Santa Ana etc. Hospital Assn.* (1962) 58 Cal.2d 806, 810 [26 Cal.Rptr. 640, 376 P.2d P.2d 568]; *Blank v. Palo Alto-Stanford Hospital Center* (1965) 234 Cal.App.2d 377, 383, fn. 2 [44 Cal.Rptr. 572].) In the words of a recent decision of the Court of Appeal, stating the proposition in its negative aspect, "[A] rule or policy decision of general application adopted by the governing authority of a hospital or professional society impinging on the right of a physician to practice his or her profession fully will not be set aside by a court *unless it is substantively irrational, unlawful or contrary to established*

*public policy or procedurally unfair."* (*Lewin* v. *St. Joseph Hospital of Orange* (1978) 82 Cal.App.3d 368, 385 [146 Cal.Rptr. 892], italics added.) By the same token, and as the cases we have cited attest, a rule governing the admission of qualified physicians to staff membership in any hospital,[12] whether public or private, cannot stand if it establishes a standard for admission which is substantively irrational or otherwise unreasonably susceptible of arbitrary or discriminatory application.[13] We turn to the question whether the rule before us can be said to suffer from this failing.

Plaintiff's specific contention relates to that aspect of the subject rule which permits exclusion from staff membership solely on the basis of a physician's "ability to work with others." In this respect, he urges, the subject rule is similar to the bylaw involved in our *Rosner* case,[14] *supra*, which, we there indicated, posed a substantial danger of application "as a subterfuge where considerations having no relevance to fitness are present." (58 Cal.2d at p. 598.) Here, he urges, the bylaw in question poses the same danger, permitting the exclusion of one of otherwise impeccable qualifications on the basis of personal qualities which, while perhaps offensive or abrasive to some, lack any demonstrable relationship to capability or fitness.

---

[12] The trial court found as a fact that defendant hospital "has facilities for surgery, complete laboratory, nuclear medicine, radiology and angiography, together with other facilities, and a continuing education program for its staff." It is alleged by plaintiff, and denied by defendant for lack of information or belief, that defendant "is the only hospital in the area" that possesses a number of these facilities; the trial court made no finding on this point. As we have recently pointed out, however, "the application of the common law rule does not depend on the existence of 'monopoly' power.... The judicial inquiry, rather, has consistently been focused on the practical power of the entity in question to affect substantially an important economic interest." (*Ezekial* v. *Winkley* (1977) 20 Cal.3d 267, 277 [142 Cal.Rptr. 418, 572 P.2d 32].)

[13] In so concluding, of course, we by no means declare that, in the words of the dissenting opinion, "rules for staff admission applicable to public hospitals apply equally to private hospitals." (Dis. opn., *post*, at p. 636.) We note that the opinion, while purporting to quarrel with the rule which we do state, adopts as its own a Court of Appeal opinion which explicitly declares that "standards for admission to staff privileges may not be 'so vague and ambiguous as to provide *a substantial danger of arbitrary discrimination in their application'*" (dis. opn., *post*, p. 638, italics added)—and then proceeds to apply that rare standard to the very case before us.

[14] The bylaw in *Rosner* permitted exclusion based upon a determination of the applicant's "'characteristics of cooperation, apparent ability to get along with others, and general qualifications of personality which would insure in the opinion of the [credentials] committee, that the applicant would be temperamentally and psychologically suited for cooperative staff hospital functions with other members of the Medical Staff and with other hospital personnel.'" (58 Cal.2d at p. 596.)

We do not agree. Not only is *Rosner* distinguishable on technical grounds,[15] but the bylaw there involved bears marked differences from the one which here concerns us. In the first place the *Rosner* bylaw spoke in terms of "apparent ability to *get along with* others," whereas the instant bylaw places its focus on the "ability to *work with* others." We perceive a substantial distinction between these two requirements, the second shifting the focus from general compatibility to the ability to cooperate in the performance of hospital functions. More significantly, the bylaw here in question, unlike that in *Rosner*, must in our view be read to demand that there be a demonstrable nexus between the applicant's ability to "work with" others and the effect of that ability on the quality of patient care provided. What is required, in short, is that an applicant demonstrate that he has the ability to "work with" others in the hospital environment in a manner which, in the words of the bylaw, will insure "that any patient treated by [him] in the hospital will be given a high quality of medical care. . . ."

We do not believe that this bylaw, as so construed, may be said to suffer from the substantive irrationality of which plaintiff complains. (Cf. *Morrison* v. *State Board of Education* (1969) 1 Cal.3d 214, 230-233 [82 Cal.Rptr. 175, 461 P.2d 375].) It cannot be denied that the providing of high quality patient care is, quite properly, the primary concern of all hospital institutions. The governing authority bears the responsibility for assuring that this goal is achieved to the greatest extent possible, and its decisions relating to medical staff must take into account all factors which have a legitimate relationship to it. We are not prepared to say that an applicant's ability to work with other medical personnel in the hospital setting may not have a clear effect on the

---

[15]The hospital involved in *Rosner* was one maintained by a local hospital district and as such was governed by the provisions of The Local Hospital District Law. (Health & Saf. Code, § 32000 et seq.) Although our decision contains language applicable to eligibility standards in general, our narrow holding was that the standards for eligibility in *district* hospitals were those set forth in Health and Safety Code section 32128, which as then constituted looked only to competence and made no reference to general suitability for hospital practice as a condition of eligibility. Section 32128 has since been amended to provide that the rules of a district hospital shall include "2. Provision for procedure for appointment and reappointment of medical staff as provided by the standards of the Joint Committee [*sic*] on Accreditation of Hospitals."

The model bylaws of the Joint Commission on Accreditation of Hospitals, of which we take judicial notice (Evid. Code, § 452, subd. (h)), contain a staff eligibility provision which is substantially identical to the one we here consider. (See Joint Commission on Accreditation of Hospitals, Guidelines for Formulation of Medical Staff Bylaws, Rules and Regulations (1971) art. III, § 2(a), p. 7.) (See generally *Anton* v. *San Antonio Community Hosp.* (1977) 19 Cal.3d 802, 818-820 [140 Cal.Rptr. 442, 567 P.2d 1162].)

level of patient care provided. (See generally, Note, *Hospital Staff Privileges: The Need for Legislation* (1965) 17 Stan.L.Rev. 900, 916.) What we do say, however, is that in order to avoid the danger of arbitrary and irrational application and the concommitant danger that such a bylaw may be used "as a subterfuge where considerations having no relevance to fitness are present" (*Rosner, supra,* at p. 598), it must be read to demand a showing, in cases of rejection on this ground, that an applicant's inability to "work with others" in the hospital setting is such as to present a real and substantial danger that patients treated by him might receive other than a "high quality of medical care" at the facility if he were admitted to membership.

Defendant urges that we need not go so far. Relying on a number of decisions from other jurisdictions—most notably that in *Huffaker v. Bailey* (1975) 273 Ore. 273 [540 P.2d 398]—it argues in essence that a physician's ability to "work with others" in the hospital setting has an inherent effect on the level of patient care provided, and that in the absence of a manifest abuse of discretion the decision of the hospital must be sustained in all cases where a reduction in such ability is shown. We do not agree. It is quite true, of course, that certain forms of disruptive or noncooperative conduct may have an adverse effect upon the level of patient care; we find ourselves in full accord with language to this effect in *Huffaker* and certain other cases.[16] We think it also clear, however, that a concept so broad as "working with others" might well be deemed to include other forms of conduct which, while assertive and even abrasive in character, cannot be shown to present a significant danger that the level of patient care will be adversely affected. As we pointed out in *Rosner,* "[i]n asserting their views as to proper treatment and hospital practices, many physicians will become involved in a certain amount of dispute and friction, and a determination that such common occurrences have more than their usual significance and show temperamental unsuitability for hospital practice of one of the doctors is of necessity

---

[16]"[I]n the modern hospital, staff members are frequently required to work together or in teams, and a member who, because of personality or otherwise, is incapable of getting along, *could* severely hinder the effective treatment of patients." (*Huffaker v. Bailey, supra,* 273 Ore. 273, 278, italics added.)

"The absence of a compatible team working together *could* impair the doctor's performance and consequently undermine the effectiveness of the treatment given the patient." (*Silver v. Castle Memorial Hosp.* (1972) 53 Hawaii 475, 479 [497 P.2d 564], fn. omitted, italics added.)

highly conjectural." (58 Cal.2d at p. 598.) The subject bylaw, if interpreted in the manner suggested by defendant, would permit exclusion of an otherwise qualified physician on just such "conjectural" grounds. Accordingly, and in order to preclude this danger, we must insist upon the narrower interpretation we have indicated.[17]

## III

■ Turning to the record, we there encounter what must be termed a state of considerable confusion concerning the content of the standard to be applied. On the one hand it appears to have been the view of the medical executive committee that a showing of significant limitations in an applicant's ability to "get along" with other hospital personnel was sufficient in and of itself to justify rejection under the subject bylaw. On the other hand it appears to have been plaintiff's view that the only showing upon which the subject bylaw would permit rejection on grounds of incompatibility would be one indicating the applicant's inability to work effectively and harmoniously with other doctors in the joint care of a particular patient. Faced with these conflicting points of view, the members of the two deliberative bodies involved (i.e., the judicial review committee and the appellate review committee) at several points manifested uncertainty as to the correct standard to be applied.[18]

---

[17]The Supreme Court of Hawaii, we note, in a case heavily relied upon by defendant itself, has stated a similar view: "It has been pointed out that 'considerations of team spirit and cooperativeness can be as important as technical skill in recommendations for staff appointments; or, put another way, professional competence in hospital practice should, according to modern hospital theory, include qualities needed for cooperative staff work.' Note, *Hospital Staff Privileges: The Need for Legislation*, 17 Stan.L.Rev. 900, 905 (1965). The requirement that a doctor have a cooperative personality does not mean, however, that exclusion by a hospital board will be upheld for other than meritorious reasons. In this respect it has been held that '[a] denial of a physician's application upon the basis that his appointment will cause disharmony among the medical staff must be clearly and persuasively supported by the record. *The record should also clearly and persuasively indicate that such prospective disharmony probably will have an adverse effect on patient care and not merely annoy or displease certain physicians and administrators.*' [Citation.]" (*Silver v. Castle Memorial Hosp., supra*, 53 Hawaii 475, 479, fn. 4, italics added.)

[18]The following inquiries—posed by members of the two deliberative bodies at their respective hearings—are representative: "Cone [judicial review committee member]: Under qualifications for membership, under Section 2, Article III, there is a statement about ability to work with others and I think that is coming into question at this point. This controversial attitude that has been mentioned on several occasions and in these recommendations and that is somewhat disturbing to me, because I can't get a handle on it, I don't know what that is supposed to mean. *I don't understand that and I think*

The evidence reflected this divergence of views. The medical executive committee, generally speaking, concentrated its efforts on establishing that plaintiff, through what was frequently termed the more "controversial" or "flamboyant" aspects of his personality, had succeeded in alienating a substantial segment of the local medical community. Emphasis was placed on certain business dealings which plaintiff had had with other doctors, the history of his association in practice with other doctors, his alleged propensity for litigation, and his readiness to express his views on the treatment practices of other doctors and hospital administrative matters. No effort was made, however, to establish any direct[19] link between these considerations and their potential effect on patient care. Plaintiff, on the other hand, directed his efforts toward establishing his level of medical competence; he also sought to establish, particularly through cross-examination of hostile witnesses, that his personality traits had never resulted in perceived difficulty in the mutual care of individual patients.

The bylaw provision here before us, as we have indicated, must be read to preclude the rejection of an otherwise qualified physician from

---

it is a fundamental point and we need this explanation and I hoped you would be able to provide us with it."

" . . . . . . . . . . . . . . . . .

"Simon [appellate review committee member]: Counselor, I'm getting lost here and I want to ask a question. Each time Dr. Miller asks this question he always refers to how they get along with patient care, his counsel asks questions of how they get along with other doctors, now which, where are we? Are we on his ability to get along with other doctors or are we on his ability to get along with other doctors concerning patient care? I'm getting lost in the shuffle and there's lots of words."

[19]The medical executive committee did attempt at one point to establish through testimony that inability to "get along" with other doctors had an inherently adverse effect upon the level of patient care:

"Mour [attorney for medical executive committee]: May I ask one question. Dr. Tarleton, looking at the ability to get along in the entire hospital milieu of efficient working of committees, and efficient working of the staff which all bears on the patient care, would you agree with that, that the ability to get along in these staff meetings and with your fellow physicians, whether or not it's a one to one relationship regarding a patient, is important in the overall quality of patient care?

"Tarleton [witness]: I would agree to that statement.

"Mour: And would you agree that if you have a physician who is disliked by a reasonably large number of his fellow physicians that it will interfere with that ability to get along and render that type of quality patient care?

"Tarleton: I would agree.

"Mour: Do you think that Dr. Miller's reputation in the community is such that regardless of the one to one relationship in a particular case that you might have had that you believe that his general reputation or inability to get along or work with others would impair that ability in the hospital to render effective patient care or impair the quality of patient care?

"Tarleton: I understand your statement I would say yes. I think Dr. Miller's inability to get along with people has proven itself numerous times...."

medical staff membership unless it can be shown that he manifests an inability to "work with others" in the hospital setting which, by reason of its particular character, presents a real and substantial danger that patients treated by him at the facility might receive other than a "high quality of medical care" if he were admitted to membership. This standard, in our view, is neither so broad as defendant conceives it nor so narrow as plaintiff asserts. On the one hand, there may well be circumstances in which a doctor's limited ability to "work with" other hospital personnel, although it results in no demonstrable conflict in the joint care of individual patients, might nevertheless be shown to have a clear adverse effect on the overall "quality of medical care" offered by the facility—and therefore on the quality of care to be offered the applicant's patients as well. On the other hand, we do not believe that that nexus may be presumed. The fact that a physician seeking admission to staff membership is shown to manifest characteristics of personality which other staff members or administrators find personally disagreeable or annoying is not in itself enough, in our view, to justify rejection under the subject bylaw provision. An otherwise competent physician, although considered "controversial," outspoken, abrasive, hypercritical, or otherwise personally offensive by some of his hospital colleagues, may nevertheless have the ability to function as a valuable member of the hospital community and should not be denied the opportunity to do so as a result of personal animosities or resentments alone. To permit such application of the bylaw in question would, in the words of *Rosner*, pose a substantial danger of application "as a subterfuge where considerations having no relevance to fitness are present." Rejection on this basis can be permitted, therefore, only when it can be shown that the applicant's ability to work with others in the hospital setting is limited in a manner which would pose a realistic and specific threat to the quality of medical care to be afforded patients at the institution.

As we have suggested, the record before us falls far short of establishing such a showing. The sole attempt that was actually made to link plaintiff's personality characteristics to a foreseeable concrete effect on the level of patient care is comprised of two leading questions couched in vague generalities. (See fn. 18, *ante.*) Although "[t]he common law requirement of a fair procedure does not compel formal proceedings with all the embellishments of a court trial . . . nor adherence to a single mode of process" (*Pinsker* v. *Pacific Coast Society of Orthodontists, supra*, 12 Cal.3d 541, 555), we must insist that a hospital seeking to withhold staff membership from an otherwise qualified physician on the ground we here consider must be prepared to come forward with evi-

dence of a more concrete and specific nature—directed toward establishing the indicated link between conduct and potential effect—than that we here consider.

 It is suggested, however, that even if the determination reached by defendant lacks substantial support on the basis of the evidence above discussed, there is ample additional evidence in the record to support it. Particular attention is drawn to two areas of inquiry reflected in the record which, it is asserted, provide a basis on which defendant could properly have determined that plaintiff's *veracity* was subject to question—namely (1) that concerning his faulty recollection of the details surrounding the termination of his internship at Cook County Hospital (see fns. 7 and 8, *ante*, and accompanying text) and (2) certain allegedly libelous and untrue statements made by plaintiff in his letter to the Comprehensive Health Planning Association (see fn. 9, *ante*, and accompanying text). It is urged, in short, that an applicant's veracity is certainly a matter which a hospital board can properly consider in determining whether the requirements for staff membership have been met, and that because the instant record reveals a substantial basis for determining that plaintiff had been untruthful in the indicated respects, the decision denying staff membership must be upheld.

We cannot agree. In the first place we are troubled by questions of fair notice. As we have pointed out, the administrative proceedings herein were initiated by plaintiff in the first instance after he was informed that his application for staff membership had been rejected "on the basis of recommendations received from references furnished" by him *in the letter accompanying his application.* The compilation of recommendations which plaintiff subsequently received contained nothing relating to his veracity, although there were several which termed him "controversial" or "disruptive." The latter characterizations formed the focus of the judicial review committee hearing which followed; it was at this hearing that questions concerning plaintiff's internship were initially raised—and it was here that there occurred the temporizations on which defendant now places such heavy emphasis. The judicial review committee upheld the prior rejection, basing its conclusion "upon the determination that sufficient doubt exists concerning Doctor Miller's ability to work with others. . . ." Upon appealing this determination, plaintiff was informed by letter that the basis for refusal was his "failure to document *his good reputation* and his ability to work with others" (italics added); it was also indicated that the matter of his internship, as well as the matter of his letter to the Comprehensive

Health Planning Association, would be explored at the appellate hearing—as it was.

As we indicated in our second *Pinsker* decision (*supra*, 12 Cal.3d 541), the common law requirement of fair procedure "may be satisfied by any one of a variety of procedures which afford a fair opportunity for an applicant to present his position. As such, this court should not attempt to fix a rigid procedure that must invariably be observed. Instead, the associations themselves should retain the initial and primary responsibility for devising a method which provides an applicant *adequate notice of the 'charges' against him and a reasonable opportunity to respond.*" (12 Cal.3d at p. 555, fn. omitted, italics added.) Here the form of notice adopted upon plaintiff's initial rejection by the medical executive committee, while in our view adequate as far as it went, fell short of advising him of the full scope of the inquiry to be pursued at the judicial review committee hearing. By stating that he had been rejected "on the basis of recommendations received from references furnished by you *in your letter of September 3, 1975*" (italics added), it had the effect of suggesting to him that the focus of any further proceedings requested by him would be upon those recommendations and that his preparation for such proceedings might properly adopt a similar focus. In these circumstances, we think, it lies ill in the mouth of defendant to suggest that any uncertainty or vagueness appearing in his answers at the judicial review committee hearing on the subject of his internship, which had occurred some 14 years previously, is to be interpreted as mendacity and guile on his part.

There is yet another reason why we think that defendant's substantial evidence argument—premised on what it perceives as evidence of impaired veracity in this record—must be rejected. As we have pointed out, the dominant focus of all of the administrative proceedings with which we are here concerned was that of plaintiff's ability to work with other hospital personnel in a manner which would not impair the quality of medical care offered. The attention of all participants in the proceedings—the contending applicant and medical executive committee, their respective counsel, and members of each of the two deliberative bodies involved—was trained upon this issue in a manner leaving little doubt as to its centrality. As we have pointed out, however, this attention was largely diffused and misdirected by a failure to comprehend the true nature of the standard to be applied. To uphold the determination thus made on the basis of evidence which lay outside of,

or at least at the periphery of, this major thrust of the inquiry would not, we think, be appropriate in the circumstances.

█ It is well settled, of course, that in cases involving the imposition of a penalty or other disciplinary action by an administrative body, when it appears that some of the charges are not sustained by the evidence, the matter will be returned to the administrative body for redetermination in all cases in which there is a "real doubt" as to whether the same action would have been taken upon a proper assessment of the evidence. (See *Bonham* v. *McConnell* (1955) 45 Cal.2d 304, 306 [288 P.2d 502]; *Cooper* v. *State Bd. of Medical Examiners* (1950) 35 Cal.2d 242, 252 [217 P.2d 630, 18 A.L.R.2d 593]; see also *English* v. *City of Long Beach* (1950) 35 Cal.2d 155, 159-160 [217 P.2d 22, 18 A.L.R.2d 547]; cf. *Byrd* v. *Savage* (1963) 219 Cal.App.2d 396, 402-403 [32 Cal.Rptr. 881]; *Strode* v. *Board of Medical Examiners* (1961) 195 Cal.App.2d 291, 303-304 [15 Cal.Rptr. 879]; *Steele* v. *L.A. County Civil Service Com.* (1958) 166 Cal.App.2d 129, 139 [333 P.2d 171]; *Mast* v. *State Board of Optometry* (1956) 139 Cal.App.2d 78, 91-93 [293 P.2d 148].) A distinction has been drawn, however, between cases of this kind and those involving an *application* for a license or other privilege, it being suggested that in such cases careful scrutiny of this nature is not requisite. (See especially *Sica* v. *Board of Police Commissioners* (1962) 200 Cal.App.2d 137, 141 [19 Cal.Rptr. 277]; see also *Hora* v. *City & County of San Francisco* (1965) 233 Cal.App. 2d 375, 379 [43 Cal.Rptr. 527].) Even in these cases, however, it is intimated that the existence of a "real doubt" as to the probable determination of the administrative body upon a proper view of the evidence will necessitate a redetermination. (See *Sica, supra,* at pp. 142-146; *Morris* v. *Unemployment Ins. Appeals Bd.* (1973) 34 Cal.App.3d 1002, 1009 [110 Cal.Rptr. 630]; see also Deering, Cal. Administrative Mandamus (Cont.Ed.Bar 1966) § 5.41, p. 59.)

█ We believe that the instant case is one in which the principle of "real doubt" should properly be applied. As we have indicated, the dominant focus of these proceedings was drastically blurred by a failure of the deliberative bodies involved—and indeed the parties and their counsel as well—to properly understand and apply the hospital's own standards for admission to staff membership insofar as they concerned an applicant's ability to "work with" others. Although evidence was also presented on other matters, our reading of the record as a whole raises a significant and real doubt in our minds as to whether the deliberative bodies involved, had they been faced with only such other evidence,

would have reached the result that they did. In any case it is clear that the misconception concerning the proper content of the hospital's standards for admission resulted in a severe misapprehension of the kind and quality of plaintiff's qualifications for admission. In these circumstances, we think the proper course is to return the matter to defendant in order that it may undertake further administrative proceedings directed to the assessment of plaintiff's qualifications for admission to its medical staff in light of a proper interpretation of its standards.

The judgment is reversed with directions to issue a peremptory writ of mandate directing defendant to set aside its decision denying plaintiff's application for medical staff membership and to either grant that application or, in the alternative, to undertake further proceedings in light of this opinion.

Bird, C. J., Tobriner, J., Richardson, J., and Newman, J., concurred.

**MOSK, J.**—I dissent.

Once again the majority of this court impose upon private hospitals —as they did in *Ezekial* v. *Winkley* (1977) 20 Cal.3d 267 [142 Cal. Rptr. 418, 572 P.2d 32]—a burden that is likely to interfere with the efficient administration of such institutions. I adopt much of the same rationale that impelled me to dissent in *Ezekial* (*id.*, p. 280-284).[1]

Here the majority by *ipse dixit* declare that rules for staff admission applicable to public hospitals apply equally to private hospitals. With one significant exception, there is no authority in statute or case law to justify that conclusion. Private institutions, whether eleemosynary or operated for profit, may employ their facilities with considerably more freedom from external intervention than may those hospitals supported by the taxpayers of a state, county, city or district.

As authority to the contrary the majority rely on *Willis* v. *Santa Ana etc. Hospital Assn.* (1962) 58 Cal.2d 806, 810 [26 Cal.Rptr. 640, 376 P.2d 568], and *Blank* v. *Palo Alto-Stanford Hospital Center* (1965) 234 Cal.App.2d 377, 383 [44 Cal.Rptr. 572]. I submit that neither case is apposite. *Willis* permitted a suit to be brought under the theory of a common law conspiracy to restrain competition; obviously conspiracies

---

[1] It is perplexing that Justice Manuel, who joined my dissent in *Ezekial*, now emerges as the author of the majority opinion in the instant case.

by any agencies, public or private, are prohibited. *Blank* merely assumed the issue arguendo and cited *Willis*.

The one exception that may justify interference with operations of a private hospital arises in those instances in which the institution enjoys monopoly status. From *James* v. *Marinship* (1944) 25 Cal.2d 721 [155 P.2d 329, 160 A.L.R. 900], the seminal case on this subject by Chief Justice Gibson, to Justice Tobriner's opinion in *Westlake Community Hosp.* v. *Superior Court* (1976) 17 Cal.3d 465, 486 [131 Cal.Rptr. 90, 551 P.2d 410], "Our past decisions demonstrate that this court has been adamant in its endeavor to eradicate monopolistic control of professional opportunities." The operative words are "monopolistic control."

If this plaintiff can factually establish that the defendant hospital has such a monopoly in its area, and that denial of staff membership at that hospital has the effect of preventing him from pursuing his profession, then he may seek to invoke procedures comparable to those applicable to public hospitals.

In the absence of such evidence, however, I would reach the same conclusion as that of Justice Kaufman, dissenting in the Court of Appeal, a position urged upon us by amicus curiae California Medical Association. Therefore I adopt *in toto* Justice Kaufman's opinion as my own. It follows: I dissent. In a misguided effort to rescue one litigant from the consequences of his own irresponsible irascibility the majority preclude every hospital in the State of California from considering in medical staff admission decisions a factor vital to the competent operation of a hospital and the delivery of high quality medical services—the ability of the physician-applicant to work cooperatively with others.

As has been cogently noted, "... it is difficult to understand how a hospital is to adhere to modern concepts of hospital administration if it cannot consider the ability of its staff members to cooperate...." (Note, *Hospital Staff Privileges: The Need for Legislation* (1965) 17 Stan.L.Rev. 900, 916.) "When considering the interest of the patient, it is not enough that his doctor possess the necessary skills of his profession. The absence of a compatible team working together could impair the doctor's performance and consequently undermine the effectiveness of the treatment given the patient." (*Silver* v. *Castle Memorial Hospital* (1972) 53 Hawaii 475, 479 [497 P.2d 564, 568].) "It has been pointed out that 'considerations of team spirit and cooperativeness can be as important as technical skill in recommendations for staff appoint-

ments; or, put another way, professional competence in hospital practice should, according to modern hospital theory, include qualities needed for cooperative staff work.'" (*Id.*, at p. 568, fn. 4, quoting from *Hospital Staff Privileges: The Need for Legislation, supra,* 17 St‹ n.L.Rev. at p. 905.)

I do not quarrel with the majority's statement of the rule of law that standards for admission to staff privileges may not be "so vague and ambiguous as to provide a substantial danger of arbitrary discrimination in their application." (*Rosner* v. *Eden Township Hospital Dist.* (1962) 58 Cal.2d 592, 598 [25 Cal.Rptr. 551, 375 P.2d 431]; accord: *Ascherman* v. *Saint Francis Memorial Hosp.* (1975) 45 Cal.App.3d 507, 513 [119 Cal.Rptr. 507]; *Martino* v. *Concord Community Hosp. Dist.* (1965) 233 Cal.App.2d 51, 58-60 [43 Cal.Rptr. 255]; *Wyatt* v. *Tahoe Forest Hospital Dist.* (1959) 174 Cal.App.2d 709, 715 [345 P.2d 93].) However, the conclusion of the majority that the standard here at issue is invalid under the stated rule is not required by the decisions nor does it serve sound public policy or promote the delivery of good medical services.

Admittedly, the substantive content of the standard "ability to work with others, with sufficient adequacy to assure. . .a high quality of medical care" cannot be quantified with precision, but "'in the area of personal fitness for medical staff privileges precise standards are difficult if not impossible to articulate. . . . The subjectives of selection simply cannot be minutely codified. The governing board of a hospital must therefore be given great latitude in prescribing the necessary qualifications for potential applicants . . . .'" (*Huffaker* v. *Bailey* (1975) 273 Ore. 273 [540 P.2d 1398, 1400], quoting from *Sosa* v. *Board of Managers of Val Verde Memorial Hospital* (5th Cir. 1971) 437 F.2d 173, 176-177.)

The evil in overly vague standards is the possibility of discriminatory or nonuniform application. (See *Rosner* v. *Eden Township Hospital Dist., supra,* 58 Cal.2d at p. 598; *Martino* v. *Concord Community Hosp. Dist., supra,* 233 Cal.App.2d at pp. 59-60; *Wyatt* v. *Tahoe Forest Hospital Dist., supra,* 174 Cal.App.2d at p. 715.) In my view, the standard, "ability to work with others, with sufficient adequacy to assure. . .a high quality of medical care," is not so vague and indefinite as to require its invalidation.

Courts are required to apply laws uniformly and in nondiscriminatory fashion too, and judges appear to have no great difficulty in doing so even when dealing with such standards as "reasonable," "good cause," and "abuse of discretion." Courts are called upon every day to apply standards the substantive content of which is no more definite than the standard here in question. The jurisprudential technique for insuring reasonably uniform and nondiscriminatory application of most legal standards is review for abuse of discretion. The same technique would serve well in the problem at hand. As the Supreme Court of Oregon stated in *Huffaker* v. *Bailey, supra,* 540 P.2d at pp. 1399-1400: "Rather than curtailing the discretion at the outset for failure to define that which would be difficult to define in any event, the court should more appropriately look to the exercise of the discretion to see if it has been abused."

The trial court determined that respondent's decision not to grant appellant's application for staff membership was supported by substantial evidence and was not arbitrary or discriminatory and did not constitute an abuse of discretion. The trial court's determination was clearly correct. Viewing the evidence most favorably to the judgment and the administrative determination, a duty entirely neglected by the majority, an abundance of evidence is apparent from which respondent could quite properly conclude that appellant's admission to staff would, without any redeeming justification, be disruptive and endanger the quality of medical service to patients.

Dr. Russell Dunlop, a physician specializing in general surgery practicing in Indio and a member of the staff of respondent as well as the staffs of Indio Community Hospital and Valley Memorial Hospital, testified that appellant's reputation in the community for getting along with other members of the medical profession was bad; that "Dr. Miller creates dissension." That virtually the entire staff at Indio Community Hospital was unhappy about appellant being on the staff there; that at least 10 named physicians on the staff at Indio Community Hospital had expressed to him their feeling that appellant should not be on that staff and 4 other physicians on that staff had expressed their unhappiness with appellant's staff membership, all within the preceding year. Dr. Dunlop stated that one of the reasons for appellant's reputation was the manner in which he conducted the emergency room at Indio Community Hospital when he was in charge of it. In Dr. Dunlop's opinion appellant admitted too many people to the emergency room and over-

treated such people in an attempt to get the hospital "out of the red into the black." Moreover, it was Dr. Dunlop's opinion that appellant had damaged the reputation of Indio Community Hospital by his conduct while in charge of its emergency room. In this regard Dr. Dunlop testified that when Indio Community Hospital was sold to a group of physicians, the purchasers required the sellers as a condition of the sale to pay off the appellant's emergency room contract; they would not enter into the transaction if appellant remained in charge of the emergency room.

Dr. Harold Tarleton who had been practicing in Coachella Valley testified that appellant did not get along with most members of the medical community. Dr. Tarleton also stated that the ability to get along with others in the hospital milieu, including committee work and staff work, is important to the overall quality of patient care and that appellant's inability to get along or work with others would impair respondent's ability to render effective patient care and would impair the quality of care furnished.

Appellant's inability to work well with others was verified to a large degree even by his own witnesses. For example, Dr. Pinnell stated that appellant had brought a number of different physicians to Coachella Valley to work with him and that many of them had become dissatisfied, apparently because they could not get along with appellant.

In addition, it cannot be overlooked that when appellant was asked whether he realized he had been involuntarily terminated from his internship at Cook County Hospital he gave evasive and less than candid answers. At the appellate review hearing a letter was introduced from the medical director of Cook County Hospital which showed that appellant served seven months of a rotating internship at Cook County Hospital from July 1961 until February 1962; that he received "D" (poor) for "physical examination, attitude toward patients, cooperation with other hospital personnel, and personality and appearance"; and that he was "asked to leave on February 1, 1962, before the completion of his Internship, because he did not assume his responsibilities to the hospital and his patients." It is unlikely appellant "didn't remember" the details of the termination of his residency.

The cases relied upon by the majority do not compel invalidation of the standard. In *Wyatt* v. *Tahoe Forest Hospital Dist., supra,* member-

ship to the medical staff was limited to licensed physicians and surgeons "whose background, experience and training insures, in the judgment of the Board of Directors, that any patient admitted...or treated...will be given the best possible care and professional skill." (*Id.*, at pp. 712-713.) After holding that the applicable statute did not authorize the promulgation of such a standard the court "also...noted" that the rule was too vague and uncertain. (174 Cal.App.2d at p. 715.) The court's rhetorical questions are revealing: "What is the best possible care and professional skill? Would it limit the practice of medicine in the Tahoe District Hospital to physicians and surgeons who are recognized authorities in their respective fields? By what standards do the directors *who are all lay individuals* determine what is the best possible care and professional skill? The standard set up is such that admission to the staff can depend on the whim and caprice of the directors." (*Id.*, italics added.)

In *Martino* v. *Concord Community Hosp. Dist., supra*, the bylaws of the medical staff authorized the credentials committee "'to conduct a hearing at which the applicant shall be examined orally and in writing, be given such tests, oral and written, as the Credentials Committee shall in its discretion determine.'" (233 Cal.App.2d at p. 54.) The court concluded: "[T]he examination requirement set forth in the medical staff bylaws...authorizes the credentials committee to require that an applicant take tests covering far more than his competence in his own particular field of medicine. It is...apparent that the examination requirement is couched in such vague and ambiguous language as to furnish the committee with no adequate standards for applying said requirement." (233 Cal.App.2d at p. 60.)

Cursory analysis of *Rosner* v. *Eden Township Hospital Dist., supra*, does lend some support to the majority's position. However, more detailed analysis discloses that it is not controlling. There the governing instruments provided "that an applicant for membership shall submit proof of worthiness of character, excellence of reputation as to professional ethics, and general suitability for hospital practice, and that the credentials committee in investigating the applicant shall determine his 'characteristics of cooperation, apparent ability to get along with others, and general qualifications of personality which would insure in the opinion of the committee that the applicant would be temperamentally and psychologically suited for cooperative staff hospital functions with other members of the Medical Staff and with other hospital personnel.'" (58 Cal.2d at p. 596.)

The court first restrictively interpreted the applicable statutory provisions and held that a public hospital district was not statutorily authorized to adopt such a standard for staff admission. Then the court, as a "[m]oreover," stated the rule that standards that are so vague and ambiguous as to provide a substantial danger of arbitrary discrimination in their application are invalid. However, the court's application of the rule was to that part of the standard referring to temperamental unsuitability for hospital practice (58 Cal.2d at p. 598); in the paragraph setting forth and discussing the void-for-vagueness rule, the part of the standard relating to the applicant's ability to get along with others was not mentioned. What the court stated with respect to that part of the standard was: "The fact that a doctor, *due to criticisms made by him relating to treatment of patients or hospital practices*, has been 'unable to get along with' some doctors or hospital personnel is not a sufficient ground to exclude him from the use of hospitals. Obviously physicians will not always agree as to the proper treatment for a patient or as to the proper practices in a hospital." (58 Cal.2d at p. 598, italics added.)

A judicial decision cannot be properly interpreted without reference to its facts. With respect to that part of the standard dealing with inability to get along with others, what the court said and what it meant in the *Rosner* decision was that where the inability to get along with others is shown to have resulted from criticisms of treatment and procedures that the applicant felt were substandard, even negligent, the applicant cannot be denied admission to staff on that account. The facts in *Rosner* were that the applicant had criticized certain treatment, procedures and personnel to the end of obtaining better treatment for patients. As the court observed: "Insofar as the merits of the controversies occurring at those hospitals can be determined from the record before us, Dr. Rosner appears in a more favorable light than the other medical personnel involved." (58 Cal.2d at p. 595.) Dr. Rosner stated his opinion that certain events constituted malpractice and had apparently testified for plaintiffs in malpractice cases. Underlying the entire decision was the court's revealing statement: "The goal of providing high standards of medical care requires that physicians be permitted to assert their views when they feel that treatment of patients is improper or that negligent hospital practices are being followed. Considerations of harmony in the hospital must give way where the welfare of patients is involved, and a physician by making his objections known, whether or not tactfully done, should not be required to risk his right to practice medicine." (58 Cal.2d at p. 598.)

In the case at bench the evidence firmly supports the conclusion that appellant's inability to work with others was not substantially related to any attempt on his part to improve the quality of medical services being furnished to patients. It is true that the executive committee introduced into evidence a letter written by appellant to the executive director of the Comprehensive Health Planning Association objecting to the granting of an application for additional beds by Desert Hospital in which he made derogatory statements about respondent, Desert Hospital and a number of other persons. A fragment of this letter (approximately one-half page of a five-and-a-half page letter) is set forth in footnote 9 of the majority opinion. The fragment of the letter selected by the majority depicts appellant in a favorable light. In fact, however, in the letter appellant stated as facts that Desert Hospital had falsified the statistical data presented to CHPA, that Desert Hospital and respondent had colluded and entered into a secret agreement to eliminate all opposition to Desert Hospital's proposal for additional beds, that such agreement was carried out through misrepresentations "by attorneys and other community politicians" and constituted the "deliberate suppression of material contrary to Desert Hospital's proposed plan for additional hospital beds...because those individuals so representing the opposition were 'bought off'...."

The trial court did not find that appellant was denied staff admission because of the fact he wrote that letter, and although the majority imply that that might have been a reason appellant's application for staff privileges was rejected, they refer to no evidence supporting that implication. Moreover, on being questioned about the letter appellant admitted that, other than hearsay, he had no awareness of the results of the Stanford University research project or, indeed, whether any such project was ever conducted. He could not recall whether he knew who was "bought off." When asked whether he believed his statement that respondent hospital was supported by millionaires strictly as a tax gimmick, appellant stated: "Oh, I may have made a mistake at the time and I'll admit a lot of it was hearsay...." In addition appellant admitted he did not have any facts with respect to the alleged tax gimmick involved and stated: "[M]aybe I was a little presumptuous."

Were there a factual finding supported by evidence that appellant was denied staff membership on the basis of his writing the letter, the case might fall within the purview of the *Rosner* decision, but I am aware of no such finding or evidence. Moreover, it would hardly be unreasonable or irrational to conclude from the evidence that appellant's

writing this letter, having the potential of seriously affecting the delivery of health care services in the desert area, without investigating the facts constituted the height of irresponsibility.

Appellant's other contentions are without merit. I would affirm the judgment.

Clark, J., concurred.