Filed 2/26/26  Villa v. Modica CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| SALVADOR VILLA,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>THOMAS MODICA et al.,<br><br>    Defendants and Respondents. | B346412<br><br>(Los Angeles County Super. Ct. No. 23LBCP00459) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael P. Vicencia, Judge.  Reversed and remanded with directions.

Law Office of James E. Trott and James E. Trott for Plaintiff and Appellant.

Dawn McIntosh, City Attorney, and Gary J. Anderson, Assistant Deputy City Attorney, for Defendants and Respondents.

_____

The City of Long Beach (City) discharged Detective Salvador Villa from the Long Beach Police Department (LBPD or Department) based on four charges arising from his operation while on duty of a private e-commerce business selling "challenge coins," plastic badges, and other products using the name and images of the LBPD, and two charges alleging he was untruthful during internal affairs (IA) interviews about his business. The Long Beach Civil Service Commission (Commission) sustained the four charges relating to Villa's operation of the business and one of the two charges for untruthfulness, and it affirmed Villa's discharge. The trial court issued a writ of mandate reversing the sustained untruthfulness charge but upholding the discharge.

On appeal, Villa contends the trial court erred in failing to order the Commission to reconsider the penalty in light of reversal of the untruthfulness charge. In the alternative, Villa argues the court should have reversed the Commission's order discharging Villa because the remaining charges for conducting business were minor. We agree with Villa's first contention and reverse the judgment. We direct the trial court to issue a peremptory writ of mandate requiring the Commission to reconsider the appropriate penalty based on the four remaining charges.

## FACTUAL AND PROCEDURAL BACKGROUND

A.  *Villa's Employment, E-commerce Business, the First IA Investigation, and the Letter of Reprimand*

Villa worked for the Department as a detective in the juvenile investigations and financial crimes units from 2016 until his discharge in November 2021. He previously worked for the

Department from 2004 through 2007 but had resigned to work for two other police departments.

In June 2019 Villa started a private e-commerce business named Clear Hot Gear.  The business coordinated with vendors to create and sell products on Villa's business website, including challenge coins,[1] patches, and plastic badges, some of which displayed text or insignia referencing the Department.  For example, the business sold a plastic version of the LBPD badge.  Villa's then-19-year-old stepson, Christian Martinez, worked for the business, assisting with packaging and shipping orders.

In late 2019 the Department opened an IA investigation into Villa's business after one of the business's vendors filed a payment-related complaint with the Department.  On May 27, 2020 Sergeant Robert Ryan conducted an IA interview of Villa in which Sergeant Ryan inquired about the business's finances and the products it sold.

In June or July 2020, Commander Steve Lauricella called Villa into his office and stated he had received pictures of items sold on the business's website containing the name or images of the LBPD.  Commander Lauricella ordered Villa to stop selling the products because they were trademarked.  Villa did not tell Commander Lauricella (despite his later claim) that he no longer owned the business.

---

[1]      At the Commission hearing, LBPD Commander Bryan LeBaron described challenge coins as collectible coins produced by Department units and sold (typically for about $10) or given to officers, for example, at trainings.  The officers would then display the coins, trade them, or give them as gifts.  Villa's business sold some challenge coins created by Department units and others created by private vendors.

3

On September 2, 2020 the Department sent Villa a letter of reprimand based on the charge that "between June 2019 and May 2020, . . . Villa . . . engaged in collateral employment without City or Departmental approval." The letter stated Villa's conduct violated the Civil Service Rules and Regulations, the LBPD Manual, and the City's Personnel Policies and Procedures. Further, the letter warned that if Villa did not correct his "deficient performance," the Department "will impose more severe discipline for future violations of Department Rules and Regulations."

B.     *The Second IA Investigation and Notice of Proposed Discipline*

At some point following the first IA investigation, the Department tasked Lieutenant Rico Fernandez with writing a letter of transmittal summarizing the investigation. Lieutenant Fernandez disclosed that he had purchased a challenge coin from Clear Hot Gear's website approximately one month after Villa's meeting with Commander Lauricella, prompting the Department to open a second IA investigation into Villa's business.

On January 14, 2021 Villa was interviewed by the IA unit. During the interview, Villa twice responded "No" when asked whether he ever conducted business related to Clear Hot Gear while on duty with the Department. He stated he sold the business to Martinez by a letter Villa drafted a week or two after his May 27, 2020 interview with Sergeant Ryan. When asked whether he had a copy of the letter, Villa stated he did not bring a copy to the interview but he could "track down the original one."

4

After the January 2021 interview, the IA unit conducted a forensic search of Villa's work computer and email account. The search revealed six instances before the May 2020 IA interview in which Villa either accessed documents related to his business stored on his work computer or sent business-related documents between his City and personal email addresses. The search also revealed that on August 20, 2020 (after his meeting with Commander Lauricella), Villa downloaded and accessed on his work computer a vendor inventory form that listed products Clear Hot Gear purchased from the vendor and then sold on its website (the vendor product list).

On July 13, 2021 Villa had a second IA interview. Villa admitted to using his City email address to send business-related emails but explained he did this on his breaks or after his shift. Villa was unable to explain why he accessed the vendor product list on his work computer over two months after he sold the business, although he speculated that he could have been transferring the file to a thumb drive. Villa still did not provide the letter transferring his business. During the final IA interview on August 4, 2021, the IA investigator again requested a copy of the letter transferring Clear Hot Gear, but Villa did not provide it.

On August 18, 2021 Villa received a notice of proposed discipline from the Department stating the following charges: (1) using the LBPD name to sell a "Long Beach 2020 Riots Challenge Coin" in 2020 in a way that was inconsistent with Department values and brought discredit to the Department; (2) using the Department badge, name, or prestige for personal gain in 2019 and 2020 by selling souvenirs using the Department name or insignias on the Clear Hot Gear website without prior

5

approval; (3) using Department facilities and equipment for personal gain when in June 2019 he used a photo taken inside a Department vehicle to market his business without prior approval; (4) using city computers, equipment, email, and the Internet between June 21, 2019 and April 29, 2020 while on duty to conduct personal business activities; (5) being untruthful during his January 14, 2021 IA interview when he said he never conducted business for Clear Hot Gear while on duty; and (6) being untruthful during his January 14 and July 13, 2021 IA interviews by stating he had relinquished ownership of Clear Hot Gear approximately two weeks after his May 2020 IA interview. The notice cited violations of the Civil Service Rules and Regulations and LBPD Manual, and it recommended dismissal.

C.   *Villa's* Skelly *Hearing, Discharge, and Appeal to the Commission*

On October 20, 2021 Villa attended a *Skelly*[2] hearing with his counsel overseen by LBPD Commander Bryan LeBaron. Villa presented a letter admitting to charges 1 through 4. He explained as to charge 5 that he answered "No" in the first IA interview to the question whether he had conducted business for Clear Hot Gear while on duty because he thought the question concerned processing, picking up, and delivering orders. Villa

---

[2]   In *Skelly v. State Personnel Board* (1975) 15 Cal.3d 194, 215, the Supreme Court held a permanent civil service employee has a due process right to certain pre-removal safeguards, including "notice of the proposed action, the reasons therefor, a copy of the charges and materials upon which the action is based, and the right to respond, either orally or in writing, to the authority initially imposing discipline."

6

asserted that when he was later asked more specific questions, including whether he had used the City's electronic property, such as a "scanner/printer," he admitted to it. With respect to charge 6, Villa provided a June 6, 2020 bill of sale signed by him and Martinez that transferred Clear Hot Gear's ownership rights and assets to Martinez.

Following the *Skelly* hearing, then-Chief Robert Luna met with then-Assistant Chief Wally Hebeish and Commander LeBaron, and Chief Luna decided to sustain all six charges against Villa and to discharge him. On November 24, 2021 the Department served Villa with a dismissal letter, which cited the six charges in the notice of proposed discipline. Villa appealed his discharge to the Commission, and the Commission held a hearing on October 26, 2022.

D.    *The Commission Hearing*

1.    *Villa's Testimony*

At the beginning of the hearing, Villa stipulated to charges 1 through 4.[3] Villa testified that while he was operating Clear Hot Gear, he sold coins and patches provided by the Department's homicide and robbery units with approval from a superior officer.

With respect to charge 5, Villa confirmed that during his January 2021 IA interview, he responded "No" to questions regarding conducting business while on duty. Villa explained

---

[3]    With respect to charge 1, Villa admitted to selling the challenge coin but not that the coin was inconsistent with the integrity or values of the Department. Despite this limited admission, the Commission sustained the charge, and Villa did not challenge that finding in his petition in the trial court.

that investigators had been asking numerous questions about transactions, and he thought the questions were about "hand-to-hand transactions—drop offs, pick ups," as opposed to copying or scanning.

Regarding charge 6, Villa testified he was not concerned about complying with Commander Lauricella's order to stop selling products on his website because he had already sold the business to Martinez by the time of the meeting. Villa acknowledged he accessed the vendor product list on his work computer in August of 2020, but he stated he did so because he was looking for items he might be interested in purchasing, not because he was conducting business for Clear Hot Gear.

### 2.    *Martinez's Testimony*

Martinez testified he worked for Clear Hot Gear until he purchased the business from Villa on June 6, 2020. Villa told Martinez he no longer had time for the business, and Martinez offered to take it over after noticing Villa was stressed and dealing with the Long Beach riots and the impacts of COVID-19 at work. The two men met on June 6, Martinez offered Villa $500 to purchase the business, and Villa accepted. Villa then presented the bill of sale, and they both signed it. Thereafter, Martinez took full control of Clear Hot Gear's day-to-day operations, and Villa had no further involvement or interest in the business.

### 3.   *Commander LeBaron's Testimony*

Commander LeBaron testified on behalf of Chiefs of Police Luna and Hebeish.[4]  Because Villa stipulated to charges 1 through 4, Commander LeBaron's testimony was mostly limited to charges 5 and 6 and the Department's decision to discharge Villa.  However, Commander LeBaron briefly discussed the Department's policy for personal use of Department equipment (charge 4).

Commander LeBaron testified that Department personnel were required to sign a policy addressing personal use of work devices, but sergeants did not routinely audit or follow up on the policy.  Rather, they were "more strict about being untruthful about [personal use]."  Employees were allowed to briefly purchase personal goods online while at work and take personal calls, as long as they were reasonable and the personal conduct did not interfere with their work.  Department policy did not categorize personal profit-seeking conduct any differently, although Commander LeBaron believed supervisors would perceive that conduct as more serious.

Commander LeBaron explained as to charge 5 that the search of Villa's work computer and email account showed Villa had been untruthful because the results of the search contradicted his claim he had not conducted business for Clear

---

[4]    Chief Luna was the chief of police at the time the Department made the decision in 2021 to discharge Villa, and his name appears on the dismissal letter.  However, by the time of the October 2022 Commission hearing, Chief Hebeish had become chief of police.  Commander LeBaron testified that Chief Hebeish stated he would have discharged Villa had he been chief at the time of the dismissal.

9

Hot Gear while on duty. Commander LeBaron did not find credible Villa's explanation that he understood the question to refer to his picking up and delivering orders on duty because his business involved reselling products to be shipped by someone else, not Villa making personal deliveries. Villa's other explanation that he only conducted business during breaks or after his shift was also not credible because there was no such thing as an off-duty or unpaid break for Department officers given that they were paid and expected to work during their breaks.

Regarding charge 6, Villa had been untruthful regarding selling his business because he did not provide the bill of sale until his *Skelly* hearing, and the bill of sale inconsistently referred to the transfer of the business in the present tense but the signing of the agreement in the past tense ("This agreement was signed on June 6"). Further, in August 2020 Villa accessed the vendor product list despite claiming he had sold the business.

Commander LeBaron testified that Chief Luna found dismissal was "the appropriate discipline for Detective Villa" based on the Department sustaining all six charges. He elaborated on the two principal bases for Chief Luna's discharge decision. First, Chief Luna believed Villa's business damaged the Department's image and reputation because the products Clear Hot Gear sold were "celebrating a long period of civil unrest against police brutality" at a time when the Department "was under extreme scrutiny" in the wake of George Floyd's murder. On May 30, 2020, following the murder of Floyd, the City had experienced a night of civil unrest that turned violent and involved looting and arson. The "trust between . . . the public and the Department was under a lot of strain," and the images on

Clear Hot Gear's products were "not in line with the priorities of what the chief of police was promoting."

For example, the business sold a challenge coin (the 2020 Riots coin) that on one side depicted a logo reading "LB" with a thin blue line surrounded by the script "Long Beach Police Dept" and "2020 Riots" and on the other side depicted a skull wearing a gas mask with crossed batons surrounded by text reading "A Watch," "B Watch," "Hats & Bats," and "Police, Sheriff, CHP, Fire, National Guard." (Capitalization omitted.) The phrase "Hats & Bats" referred to when a police officer works on riot and crowd control details because the officer would need to put on a riot helmet and carry a longer riot baton. The skeleton with a gas mask had a helmet with what looked like a badge with an LBPD insignia. The agencies named on the coin were the ones that responded to the civil unrest. The coin's text and images thereby appeared to inappropriately glorify the Department's response to the riots and civil unrest following George Floyd's murder. In addition, challenge coins sold or given out by the Department are authorized by the Department and sold or given to officers at trainings, but Villa's challenge coins were created by the vendor without authorization from the Department and displayed images or insignia the Department did not use on its coins.

Commander LeBaron acknowledged that sergeants and secretaries of police units would sell Department-authorized coins to LBPD officers. For instance, the Department's homicide and sex crime units had coins they would sell, and vendors that worked with law enforcement would produce them. Commander LeBaron recalled receiving a coin from the financial crimes unit around the same time when the Department was under

11

significant scrutiny. The coin displayed an image inconsistent with the chief's priorities, and Commander LeBaron's deputy chief said the coin was unauthorized and ordered it to not be produced.

Commander LeBaron explained the second reason for the dismissal was that Chief Luna "expect[ed] every officer to be honest. If an officer isn't honest, and in this case he found that Mr. Villa wasn't, then . . . the consequence of that allegation would be dismissal like any other truthfulness case." Commander LeBaron added that officers were required to be truthful at all times without exception.

E. *The Commission's Decision*

On October 26, 2022 the Commission accepted Villa's stipulation to charges 1 through 4 and found by a preponderance of the evidence that Villa committed the acts alleged in charge 5, which violated the Department's Civil Service Rules and Regulations and the LBPD manual. However, the Commission did not find that Villa had violated the rules and regulations or manual as to charge 6. The Commission concurred with the City's decision to discharge Villa.

F. *The Trial Court's Decision*

On December 4, 2023 Villa filed a verified petition for writ of mandate under Code of Civil Procedure section 1094.5 in the trial court, challenging the Commission's finding as to charge 5 (pertaining to Villa's alleged untruthfulness in his January 2021 IA interview about conducting business while on duty) and the decision to discharge Villa. After a hearing, the court issued a minute order and judgment reversing charge 5 but upholding

12

Villa's discharge.  The court stated that charges 3 and 4 involved the "de minimis use of office equipment for personal matters," and they "do not appear to be grounds for discipline" given Commander LeBaron's testimony that Department employees could briefly use Department computers and landline telephones for personal matters, and there was no rigorous enforcement of the Department's rule against personal use.

However, the trial court found that "[n]othing in the record indicates that the Commission would not have chosen the same level of discipline based on the admitted charges.  The court cannot reverse the administrative decision on the basis of the penalty being too harsh; the court's review is limited to whether respondents met their burden of sustaining the charges levied against petitioner.  (See *Cassidy v. California Bd. of Accountancy* (2013) 220 Cal.App.4th 620, 627 [(*Cassidy*)])."

Villa timely appealed.

## DISCUSSION

A.    *Standard of Review*

Generally, "'[in] a mandamus proceeding to review an administrative order, the determination of the penalty by the administrative body will not be disturbed unless there has been an abuse of its discretion.'" (*Skelly v. State Personnel Board* (1975) 15 Cal.3d 194, 217 (*Skelly*); accord, *Pasos v. Los Angeles County Civil Service Com.* (2020) 52 Cal.App.5th 690, 700; *Cassidy, supra*, 220 Cal.App.4th at p. 633.)  When the penalty is subsequently appealed after the trial court's review, "'an appellate court vis-a-vis *the trial court,* conducts a de novo review concerning possible abuse of discretion by the administrative

13

agency.'" (*Pollak v. State Personnel Bd.* (2001) 88 Cal.App.4th 1394, 1404; accord, *Pasos*, at p. 700; *Cassidy*, at p. 627 ["we review de novo whether the agency's imposition of a particular penalty on the petitioner constituted an abuse of discretion by the agency"].)

However, where the trial court reverses some of the charges sustained by the agency, a different standard applies to whether the penalty should be upheld. As the Supreme Court explained in *Miller v. Eisenhower Medical Center* (1980) 27 Cal.3d 614, 635 (*Miller*), "It is well settled . . . that in cases involving the imposition of a penalty or other disciplinary action by an administrative body, when it appears that some of the charges are not sustained by the evidence, the matter will be returned to the administrative body for redetermination in all cases in which there is a 'real doubt' as to whether the same action would have been taken upon a proper assessment of the evidence." (Accord, *Franz v. Board of Medical Quality Assurance* (1982) 31 Cal.3d 124, 145 (*Franz*); *Griego v. City of Barstow* (2023) 87 Cal.App.5th 133, 141 (*Griego*).) Real doubt exists where a court "cannot say [the findings held improper] had no influence in setting the discipline" (*Franz*, at p. 145), or where a court's "reading of the record as a whole raises a significant and real doubt . . . as to whether the deliberative bod[y] involved, had [it] been faced with only such [appropriate] evidence, would have reached the result that they did" (*Miller*, at pp. 635-636).

14

B.     *The Trial Court Erred by Not Remanding the Case to the*
       *Commission To Reconsider Villa's Penalty*[5]

Villa contends the trial court misapplied the standard
governing remand after it reversed the untruthfulness charge,
and further, there was a doubt about what discipline the
Commission would have imposed without the untruthfulness
charge because that was the most serious charge.  We agree on
both counts.

The trial court cited *Cassidy, supra*, 220 Cal.App.4th at
page 627, in concluding the court could not reverse the agency's
decision "on the basis of the penalty being too harsh," and
instead, "the court's review is limited to whether respondents met
their burden of sustaining the charges."  The court correctly
stated the general standard for reviewing the agency's penalty,
that "'"[t]he penalty imposed by an administrative body will not
be disturbed in mandamus proceedings unless an abuse of
discretion is demonstrated."'"  (*Id*. at p. 633.)  But *Cassidy*
involved a different situation—there, the trial court found the
agency's findings were supported by substantial evidence, as did
the Court of Appeal.  (*Id*. at pp. 624, 631-633.)  Thus, the question
for the trial court (and the appellate court) was whether the
agency abused its discretion in imposing the discipline on the
sustained charges.  (*Id*. at p. 633.)

---

[5]     Because we conclude the case must be remanded for the
Commission to reconsider Villa's penalty, we do not reach Villa's
contention that discharge of Villa based on the four remaining
charges would be excessive.  This is a determination for the
Commission to make in the first instance.

15

By contrast, because the trial court here found charge 5 for untruthfulness was not supported by the evidence, the court had to decide whether there was any doubt the Commission would have discharged Villa on the remaining four charges, two of which the court described as "de minimis" and insufficient to support termination. (See *Miller, supra*, 27 Cal.3d at p. 635.) We recognize the court pointed out that "[n]othing in the record indicates that the Commission would not have chosen the same level of discipline based on the admitted charges," but it did not consider the no-real-doubt standard. Under that standard, the court would have needed to find the untruthfulness charge "had no influence in setting the discipline" to support a decision not to return the matter to the Commission. (*Franz, supra*, 31 Cal.3d at p. 145.) And, as discussed, the trial court made clear its view it had no authority to reverse the discharge penalty for being too harsh, even if the Commission would have done so.

Moreover, even if we read the trial court's ruling to apply the correct standard, the record does not support a finding there was no real doubt the Commission would have upheld Villa's discharge without sustaining the charge that Villa was untruthful about conducting his business while on duty, because charge 5 clearly influenced the Commission's decision to uphold Villa's termination. Commander LeBaron testified that Chief Luna's decision to discharge Villa was based on all six charges, that officers were required to be truthful "without exception," and that "the consequence of that allegation [in charge 5] would be dismissal *like any other untruthfulness case*." (Italics added.) But Commander LeBaron never stated Villa had to be dismissed for his misconduct with respect to operating the business and selling challenge coins on duty, or that Villa's conduct would likely

16

continue if any lesser discipline were imposed. (See *Skelly, supra*, 15 Cal.3d at p. 218 ["relevant factors" in assessing appropriateness of discipline "include the circumstances surrounding the misconduct and the likelihood of its recurrence"].) To the contrary, given the Commission's reversal of the finding on charge 6, the Commission must have found there was insufficient evidence that Villa was untruthful when he stated he sold the business in June 2020.

Although Commander LeBaron cited the Department's concerns over the imagery on Clear Hot Gear's products that glorified the police response to the post-Floyd riots and displayed unapproved images, it is a reasonable inference that the four admitted charges played less of a role in the decision to discharge Villa. Commander LeBaron cited the 2020 Riots coin as an example of a Clear Hot Gear product that was inconsistent with Chief Luna's priorities, but he acknowledged the Department had a culture in which challenge coins depicting LBPD images were ubiquitous and frequently exchanged. Indeed, Villa procured some of the coins and patches he sold on his website from units within the Department, with supervisor approval. Commander LeBaron also described another unsanctioned challenge coin that circulated in the Department shortly before Villa's second IA investigation. Commander LeBaron testified that his deputy chief ordered the coins no longer be produced because they were not authorized, but he did not indicate that any employees were disciplined for circulating them. With respect to personal use of work equipment, Commander LeBaron acknowledged the Department did not routinely audit the policy and that it took untruthfulness regarding the policy more seriously than enforcement of the policy itself. On these facts, there remains

17

real doubt whether the Commission would have sustained Villa's discharge based on his stipulated charges alone.

*Griego, supra*, 87 Cal.App.5th 133, relied on by the City, is distinguishable. There, the City of Barstow terminated its fire captain based on four sustained findings, including his refusing to follow multiple express directives not to coach children's sports teams while on duty, having an inappropriate (but non-sexual) relationship with a high school student, carrying a concealed handgun without a permit, and lying under penalty of perjury on a court form about his possession of firearms. (*Id*. at pp. 138-139.) The trial court found there was insufficient evidence to support the sustained charge for having an inappropriate relationship and remanded for the city to reconsider the discipline. (*Id*. at p. 138.) The Court of Appeal reversed, explaining "there is no real doubt the City would terminate Griego" because the sustained conduct included a pattern of untruthfulness that included perjury; he was "unapologetically insubordinate" in "flouting direct commands from his superior"; and he violated the gun laws by carrying a concealed handgun without a permit, which would "'would reasonably tend to cause discredit to fall upon the City, its officers, agents or departments.'" (*Id*. at p. 142.)

In contrast to *Griego*, in this case it was the untruthfulness charges that were not sustained, leaving the potentially less serious charges relating to the conduct of Villa's business. The facts in this case are more like those in *Franz, supra*, 31 Cal.3d at pages 134 to 135 and 145, in which the Supreme Court held the record did not support two of six findings by the Board of Medical Quality Assurance that a doctor committed gross negligence, while upholding two charges for dishonesty and falsifying a

18

medical record.  The court remanded for the Board to reconsider whether suspension of the doctor's license was the appropriate discipline based on the remaining charges, explaining, "The findings held improper in this opinion imply serious dereliction of a doctor's duty to his patient.  We cannot say they had no influence in setting the discipline.  On the other hand, major charges have been sustained and some discipline clearly is warranted."  (*Id*. at pp. 135, 145; see *Bonham v. McConnell* (1955) 45 Cal.2d 304, 306 [trial court should have remanded case to Insurance Commissioner to exercise his discretion to determine the appropriate penalty for insurance broker's misconduct where trial court reversed three of 15 findings of misconduct].)

Because the record does not show the Commission would have imposed the same discipline on Villa had it not sustained the truthfulness charge, the agency "should not be precluded from exercising [its] discretion" to reconsider the penalty imposed.  (*Bonham v. McConnell, supra*, 45 Cal.2d at p. 306; see *Miller, supra*, 27 Cal.3d at p. 636.)  We therefore reverse the judgment and remand to the trial court to issue a peremptory writ of mandate directing the Commission to reconsider the appropriate penalty to impose on Villa based on the four remaining charges.

## DISPOSITION

The judgment of the trial court is reversed.  We direct the trial court to issue a peremptory writ of mandate requiring the Commission to reconsider the appropriate penalty for Villa's four stipulated charges.  Villa is to recover his costs on appeal.

                                                FEUER, J.

We concur:


SEGAL, Acting P. J.


GIZA, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.